H. C. BLACKWELL COMPANY, INC., a corporation, Plaintiff-Appellant,

v.

KENWORTH TRUCK COMPANY, a Division of Paccar, Inc., a corporation, Defendant-Appellee.

No. 78–3691.

United States Court of Appeals, Fifth Circuit.

June 27, 1980.

C. Lee Reeves, Birmingham, Ala., for plaintiff-appellant.

John Morrow, James P. Alexander, Linda A. Friedman, Birmingham, Ala., for defendant-appellee.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The plaintiff, H. C. Blackwell Company, instituted this action against Kenworth Truck Company, under 15 U.S.C. §§ 1221–1225 (1956), known as the Automobile Deal-

ers' Franchise Act, and sometimes as the Automobile Dealers' Day in Court Act,[1] seeking damages for claimed wrongful termination and/or non-renewal of its franchise agreement with Kenworth Truck Company. The jury returned a verdict of $90,000 in the plaintiff's favor. The district court granted the defendant's motion for judgment notwithstanding the verdict. On this appeal, the plaintiff urges that the judgment of the trial court be set aside and that a judgment in his favor be entered on the verdict of the jury. We conclude that the district court erroneously granted the defendant's motion for judgment notwithstanding the verdict.

*Context Facts*

H. C. Blackwell Company, a family owned and operated Alabama truck dealership, began distributing Kenworth trucks in 1961. The most recent franchise distributorship agreement between Kenworth and Blackwell, entered February 18, 1970, was for a term of three years. Although the written franchise agreement expired in 1973, Kenworth continued to extend the benefits of dealership status to Blackwell while negotiations were under way for a new written agreement.

Contract negotiations began in November 1975, in Seattle (the defendant's headquarters) and continued in December of that year at Birmingham. The major areas of disagreement were: (1) Kenworth's proposed reduction of Blackwell's territory; (2) length of the new contract; (3) limited liability of Blackwell; (4) personal guarantees by Blackwell's wife and son; (5) widow's and orphan's addendum; and (6) improvement of Blackwell's facilities. In July 1975 and again in December 1975, Kenworth made a contract offer that Blackwell declined to accept because of these differences.

On February 4, 1976, Kenworth advised Blackwell by letter that the then existing "informal arrangement" would terminate in ninety days, but that Kenworth would then offer Blackwell a dealer agreement if Blackwell met twelve specified demands within that period of ninety days. These demands included substantial capital improvements, increased sales, and a better bookkeeping system.[2] Blackwell attempted

1. *See generally* Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract,* 66 Yale L.J. 1135, 1171–1190 (1957); Comment, *The Automobile Dealer Franchise Act of 1956 —An Evaluation,* 48 Cornell L.Q. 711 (1963); Comment, *The Judicial Treatment of the Automobile Dealer Franchise Act,* 62 Mich.L.Rev. 310 (1963); Note, 74 Yale L.J. 354 (1964); Note, 70 Harv.L.Rev. 1239 (1957); *Annotation, Validity and Construction of Statute Regulating Dealings Between Automobile Manufacturers, Distributors, and Dealers,* 7 A.L.R.3d 1173 (1966).

2. The twelve demands listed in the February 4, 1976 letter were as follows:

   "1. Make necessary improvements to bring facilities into compliance with OSHA (Office of Safety, Health and Accident) regulations;

   2. Pave or blacktop or rock the customer parking area and provide a driver's lounge;

   3. Provide adequate lighting and heating to present to the public a well-displayed customer parts counter and service area;

   4. Provide the Service Manager and Warranty Manager with offices or work areas which are adequate to allow proper discharge of their duties;

   5. Improve the general appearance of the facility and, specifically, remove used equipment, parts, and material not associated with the day-to-day operation of a Kenworth Truck Distributorship;

   6. Staff the Parts and Service Departments with sufficient personnel, including managers, to maintain monthly-parts-sales-per-Parts-employee and monthly-service-sales-per-Service-employee at a figure reasonably consistent with Kenworth averages in the U. S. for other Kenworth Dealers in the same size of market of total sales dollar volume;

   7. Install and use an accurate inventory record system which would show historical information, present inventory levels, location, price, and other essential information;

   8. Operate both the Parts and Service Departments five days per week, consistent with state and local labor regulations and provide Parts and Service workmanship comparable to other Kenworth Dealers in the Southeast Region;

   9. Pay all obligations to Kenworth Truck Company and its affiliated companies on a timely basis;

to meet these requirements, spending approximately $90,000 in the process, according to evidence reasonably accepted by the trial jury.

Although Mr. Blackwell was unable to accomplish everything required by Kenworth within the designated ninety day time limit, he made substantial progress toward compliance with the conditions. There was testimony that, in fact, in May 1976, two Kenworth representatives inspected the plaintiff's facilities and indicated they were pleased with Blackwell's progress. Nonetheless, on June 24, 1976, Blackwell received a letter from Kenworth stating that the franchise would not be renewed because the May inspection report was "not favorable." Unable to persuade Kenworth to re-open negotiations, Blackwell brought this suit.

*The Automobile Dealers' Franchise Act*

The Automobile Dealers' Franchise Act, adopted in 1956, was designed to supplement the anti-trust laws of the United States "in order to balance the power now heavily weighed in favor of the automobile manufacturers." *See* preamble to House Report 2850, U.S.Code Cong. and Admin. News, 84th Congress, Vol. 3, p. 4596 (1956). *Accord Woodard v. General Motors Corporation*, 298 F.2d 121, 127 (5th Cir. 1962). The Act gives to an automobile dealer a federal cause of action against an automobile manufacturer who fails to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise. 15 U.S.C. § 1222. "Good faith" is statutorily defined as the duty of a dealer and a manufacturer "to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221. The Act does not contain definitions of the terms "coercion" and "intimidation."

The jurisprudence has held that evidence of actual or threatened coercion or intimidation is necessary to a showing of lack of good faith under the statute, and a mere showing of arbitrary or other bad conduct absent coercion is not a sufficient ground for recovery under the Act.[3] *E. g., Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 573 (10th Cir. 1975); *Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 712 (10th Cir. 1970); *Kotula v. Ford Motor Company*, 338 F.2d 732 (8th Cir. 1964), *cert. denied*, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *Woodard v. General Motors Corp.*, 298 F.2d 121 (5th Cir. 1962); *Berry Bros. Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542 (E.D.Pa.1966), *aff'd* 377 F.2d 552 (3rd Cir. 1967). *See also* Note, 74 Yale L.J. 354, 357–59 (1964); Note, 62 Mich.L. Rev. 310, 316–19 (1963); Note, 70 Harv.L. Rev. 1239, 1247–50 (1957).

*Judgment notwithstanding the verdict*

The district court's grant of the judgment notwithstanding the verdict cannot be sustained unless, considering the evidence with all reasonable inferences and in the light most favorable to the party opposed to the motion, the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a contrary verdict. *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc). The standard is the same on appeal as before the district court. *See Sulmeyer v. Coca-Cola Co.*, 515 F.2d 835

---

10. Submit to Kenworth timely and accurate financial statements on a quarterly basis and an annual audited statement.
11. Maintain working capital in an amount equal to or greater than $300,000 or 30% of current assets;
12. Maintain net worth the greater of $500,000 or 35% of total assets."

3. The legislative history of the Act supports these holdings: "If . . . there is an absence of coercion or intimidation . . .

then it is eminently within the right of the manufacturer to terminate or to refuse to renew the contract." 102 Cong.Rec. 12831 (daily ed. July 23, 1956). *See also* H.R.Rep.No.2850, U.S.Code Cong. and Admin.News, 84th Cong., Vol. 3, pp. 4596, 4603 (1956): "The term 'fair and equitable' as used in the bill is qualified . . . . In each case arising under this bill, good faith must be determined in the context of coercion or intimidation or threats of coercion or intimidation."

(5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Alman Brothers Farm Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295 (5th Cir. 1971).

The issue of Kenworth's bad faith involves its intentions as manifested by its actions. This is a factual determination for the jury. *Shor-Line Rambler, Inc. v. American Motors Sales*, 543 F.2d 601, 604 (7th Cir. 1976); *Rea v. Ford Motor Company*, 497 F.2d 577, 585 (3rd Cir. 1974). *See York Chrysler-Plymouth v. Chrysler Credit Corp.*, 447 F.2d 786, 792 (5th Cir. 1971). Bad faith may consist of coercive conduct manifested by "a wrongful demand which will result in sanctions if not complied with." *Rea v. Ford Motor Company, supra*, 497 F.2d at 585. "[W]hether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case." *Id.*

The district judge in granting the judgment notwithstanding the verdict expressed the view that Kenworth's two contract offers were reasonable and not wrongful. While this conclusion may be warranted, it disregards the February 4, 1976 letter containing the twelve demands.

Kenworth's regional sales manager testified that it would have taken Blackwell at least one year to meet the demands delineated in the February 4 letter. Despite the difficulty of meeting the demands, Blackwell worked diligently for ninety days and had made substantial progress in meeting those demands when its franchise was terminated. Suffice it to say that while Kenworth might have lawfully refused to renew the franchise prior to the February 4 letter, the jury might have reasonably found that the February 4 letter, with its substantial demands to be accomplished in a relatively short and possibly unreasonable time frame, was coercive (on these facts, a wrongful demand that would result in sanctions if not complied with.)

*Conclusion*

Where the trial court has granted a judgment notwithstanding the verdict we may, in appropriate cases where there is sufficient evidence (as here) to support a jury verdict to the contrary, order the reinstatement of the jury verdict. *See generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2540 at 614 (1971); 5A *Moore's Federal Practice* ¶ 50.14 at 50–121 (1980). Accordingly, the judgment of the district court, granting the defendant's motion to set aside the verdict in favor of plaintiff and to enter judgment in accordance with defendant's motion for judgment notwithstanding the verdict, is reversed; and the verdict of the jury for the plaintiff in the amount of $90,000 is reinstated and judgment entered thereon.

JUDGMENT REVERSED, VERDICT OF JURY REINSTATED AND JUDGMENT ENTERED THEREON.