**CARROLL KENWORTH TRUCK SALES, INC., a corporation, Plaintiff-Appellee,**

v.

**KENWORTH TRUCK COMPANY, A DIVISION OF PACCAR, INC., Defendant-Appellant.**

**CARROLL KENWORTH TRUCK SALES, INC., a corporation, Plaintiff-Appellant,**

v.

**KENWORTH TRUCK COMPANY, A DIVISION OF PACCAR, INC., Defendant-Appellee.**

Nos. 85–7119, 85–7139.

United States Court of Appeals, Eleventh Circuit.

Feb. 10, 1986.

---

John H. Morrow, Braxton Schell, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for defendant-appellant, and defendant-appellee.

Ronald G. Davenport, Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for plaintiff-appellee, and plaintiff-appellant.

Before GODBOLD, Chief Judge, JOHNSON, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

The plaintiff Carroll Kenworth Truck instituted this action against Kenworth Truck Company under 15 U.S.C. § 1221–1225, the Automobile Dealers Day in Court Act, and its Alabama equivalent, Section 8–20–1, *et seq.* of the Alabama Code of 1975, the Alabama Motor Vehicle Franchise Act. The plaintiff sought damages for the wrongful termination and/or non-renewal of its franchise agreement with Kenworth Truck Company. After a two-day jury trial, the jury rendered a six hundred and sixty-five thousand dollar ($665,000) verdict in favor of Carroll. Defendant filed a motion for judgment notwithstanding the verdict, or alternatively for a new trial on the ground that there was insufficient evidence to support the jury verdict. The district court denied defendant's motion for judgment notwithstanding the verdict and granted its motion for a new trial unless plaintiff agreed to a remittitur to reduce the verdict to four hundred thousand dollars ($400,000). Plaintiff agreed to the remittitur and was also awarded eighteen thousand nine hundred dollars ($18,900) in attorney's fees under the Alabama Motor Vehicle Franchise Act.

On this appeal, the defendant urges that there was no evidence to support the jury's verdict, that a new trial should have been granted because of plaintiff's improper argument, and that the verdict was so excessive that a new trial should have been granted or at a minimum a much larger remittitur should have been ordered. We partially agree with the defendant-appellant's first contention. We believe the evidence was sufficient to support a jury verdict under the Alabama statute but not under the federal statute. In accordance with this conclusion, we remand for a new trial.

## FACTS

Buddie Carroll and other members of his family formed Carroll Kenworth Truck Sales, Inc. in Montgomery, Alabama in 1971. In 1972, they entered into a one-year dealership agreement with appellant Kenworth, a manufacturer of Class 8 Diesel trucks (full size, eighteen wheel, over the road trucks). Kenworth sells its trucks solely through a network of dealerships such as Buddie Carroll's. Carroll's Montgomery dealership is located in Kenworth's Southeast Region, which is headquartered in Atlanta, Georgia.

After an initial one-year agreement, Carroll received renewals of its dealership agreement for three year terms in 1973, 1976, and 1979. One basis for determining whether a dealership would be renewed was whether it sold its quota of trucks. Until 1982, Kenworth used the following formula to arrive at a dealership's sales quota.

Kenworth first used various industry projections and attempted to determine how many heavy duty trucks would be sold in the United States as a whole during the upcoming year. The dealership's territory was then viewed from an historical standpoint to determine what percentage of the national market it comprised. Next, Kenworth reviewed sales figures on a regional basis to determine its market penetration in the Region to which each dealer was assigned. It then assigned each dealership a quota which would allow it to achieve that penetration in its territory. For example, if industry forecasts indicated that 100,000 trucks would be sold in the United States for the upcoming year, and a given dealership had historically had one (1%) percent of all new trucks sold registered in its territory, Kenworth would project that 1,000 trucks would be sold in that dealer's territory during the upcoming year. If Kenworth's historical market penetration in that dealer's region was 10%, Kenworth would assign that dealer a quota of 100 trucks, or 10% of the total anticipated registrations in his territory. At trial, a Kenworth employee, Ms. Torkko, testified that the actual computation of each individual quota simply involved the application of a mathematical formula to the projection and registration figures, and that quotas were

assigned to every Kenworth dealer on a uniform basis.

From 1973 to 1979, Carroll exceeded its quota every year except 1975 when it reached 58% of its quota and 1976 when it reached 89% of its quota. After 1979, its sales declined significantly. It failed to reach its quota in both 1980 and 1981. In 1980, its quota was 51 but it sold only 26 trucks, 51% of its quota. In 1981, it sold 23 trucks as against its quota of 47, 49% of quota.

In 1982, Kenworth changed one element of the method of calculating quotas. Rather than use Kenworth's historical penetration percentage for each region, Kenworth chose a target penetration percentage which it hoped to obtain for the upcoming year in each region, and assigned quotas based on that target percentage of anticipated registration in each dealer's territory. This new method was used to determine quotas for all Kenworth dealerships. Under this new formula, Carroll's quota for 1982 was seventy. At the end of the first three months of 1982, however, it had sold only three trucks.

The final three year contract between Carroll and Kenworth extended from March 1979 to March 1982. In determining whether to offer a renewal contract to a dealer, Kenworth customarily began its dealer evaluation approximately six months prior to the termination of the existing contract. As a part of this evaluation, a representative from each of the various departments of the region, Truck Sales, Parts, Service, Credit and Dealer Development makes a recommendation as to renewal. The final recommendation is made by the Regional Manager in conjunction with the head of Dealer Development. That recommendation, along with the underlying evaluations, is then sent to the home office in Seattle, which makes the final decision.

Kenworth began its evaluation of Carroll in the fall of 1981. Representatives for Service, Parts, and Credit evaluated Carroll favorably and recommended a three-year term for renewal. The Dealer Development representative recommended renewal of Carroll's contract but made no recommendation as to term. The Sales representative recommended a one-year term, explaining that:

Carroll exceeded its quota every year from 1973 to 1979 except 1975 and 1976.

The main intent for recommending a one year contract versus the three year contract is to get Buddie's attention for his lack of aggressiveness to deliver new trucks. The fact that he is not going to be given the security of a three year contract may awaken him and get him to perform for Kenworth. Two of the three years of his last contract, he did not attain quota.

The regional office ultimately recommended to the national office that Carroll be given a two-year contract. The National Dealer Development Manager, Robert Sergeson, decided on a one-year renewal. In making this decision, Mr. Sergeson wrote an interoffice memo pointing out the deficiencies in Carroll's dealership:

Attached is the Dealer Agreement evaluation prepared by the Southeastern Region for the subject dealer.

All departments have recommended a three-year renewal except the New Truck Department, who recommended one year. Regional management is recommending two years. The evaluation indicates conservative management in all departments, but particularly so in new and used truck merchandising. The new truck evaluation suggests implementing target account solicitation, adding two salesmen, and aggressively calling on the available potential accounts. This is a relatively modest requirement, and should be accomplished within a twelve (12) month period.

The region also requests that monthly financial statements be supplied. Please revise paragraph 13 to read:

Dealer agrees to provide to Kenworth on Kenworth forms, not later than the 25th day of the month, financial data and information for the previous month's operation.

Please prepare a one (1) year dealer agreement.

The one-year renewal contract was sent to Carroll on March 10, 1982, six days before the expiration of the existing contract. Kenworth's own internal policy required submission of the renewal contract to the dealer at least ninety days before the expiration of the current term, as did the Alabama Motor Vehicle Franchise Act. Because of the delay in transmitting the renewal contract, Kenworth extended Carroll's contract for sixty (60) days and subsequently for an additional two weeks.

Along with the one-year contract, Charles Womble, Regional Manager, sent Carroll a letter stating:

> Attached, in triplicate, is a one year Dealer Agreement which should be signed and returned to my attention for completion of the renewal process.
>
> Carroll Kenworth Truck Sales failed to achieve assigned truck quotas for 1980 and 1981 and predicated on past performance and current attitudes, is unlikely to achieve quotas for 1982. You should note that continued performance below quota guidelines will be a substantial concern to us in reviewing whether there is sufficient basis for continuing our relationship when this contract expires in March, 1983.
>
> The following recommendations are, therefore, of major importance if Carroll Kenworth Truck Sales is to become representative of a successful Kenworth franchise:
>
> 1. Employ a qualified Sales Manager for new and used trucks and extend to that individual those responsibilities and authorities inherent in that position.
> 2. Employ additional salesmen (bringing the total to three) to merchandise new and/or used trucks in your primary area of responsibility as defined by the Dealer Agreement.
> 3. Assign accounts or territories to each salesman and maintain an active referral file on customer contacts.
> 4. Maintain an inventory of new Kenworth trucks sufficient to allow your sales staff to meet competition from other dealers in Carroll Kenworth Truck Sales' primary area of responsibility. Kenworth believes that a minimum inventory of six (6) new trucks will be required to achieve this goal during 1982.
>
> Additionally, in order to more closely monitor the operational results of your dealership and to assist you in implementing the before mentioned recommendations, the required frequency of your financial statement submission has been increased.
>
> Regional employees are dedicated to making the renewal term mutually beneficial and look forward to working with you and your staff during the contract period.

Buddie Carroll deleted the one-year term, inserted three years, and sent the signed dealership agreement to Kenworth.

An internal Kenworth memorandum prepared by the Southeastern Regional Representative stated:

> As we discussed yesterday, the purpose of a one year contract is not to threaten the dealer, but to objectively address his deficiencies and offer measurable recommendations to correct these deficiencies. If the deficiencies are corrected within the one year term, we renew for three years. If the deficiencies remain, we cancel the contract and seek new representation.

Carroll points to this memorandum as a "smoking gun," and principal support for its contention that the one-year contract along with the recommendations to beef up its sales force amounted to a constructive termination. Kenworth personnel, however, testified that the letter is an oversimplification. Moreover, Kenworth points to evidence of other one-year contracts that have not resulted in terminations even when the dealer failed to meet quota.

Faced with a one-year contract renewal, Buddie Carroll perceived that his dealership was being terminated and thus brought the present action, claiming that the alleged termination was in bad faith, and thus unlawful under both federal and state law.

## DISCUSSION

### I. *Federal Automobile Dealers' Day in Court Act*

The Automobile Dealer's Franchise Act, known more colloquially as the Automobile Dealers' Day in Court Act, was enacted in 1956 in response to intense lobbying by automobile dealers who decried the inequality of bargaining power between individual dealers and their manufacturers. S. Macauley, Law and the Balance of Power—The Automobile Manufacturers and Their Dealers 43–71 (1966). It was designed "in order to balance the power now heavily weighed in favor of the automobile manufacturers." *See* preamble to House Report 2850, U.S.Code Cong. and Admin.News, 84th Cong., Vol. 3, p. 4596 (1956). *Accord, H.C. Blackwell Company, Inc. v. Kenworth Truck Company*, 620 F.2d 104, 106 (5th Cir.1980); *Woodard v. General Motors Corporation*, 298 F.2d 121, 127 (5th Cir.1962). It was not, however, designed to tilt the balance of power so heavily in favor of dealers as to handcuff a manufacturer to an undesirable and unproductive dealer. *See* H.R.Rep. No. 2850, 4603, 84th Cong., 2d Sess. (1956), U.S.Code Cong. & Admin. News 1956, pp. 4596, 4603.

■ To prevail under this statute, a dealer must show that a manufacturer failed to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise. 15 U.S.C. § 1222. Good faith is statutorily defined as:

the duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimi-

dation from the other party: Provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e) (1976). Bad faith under this Act has been defined narrowly and construed strictly. *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033 (5th Cir.1981). It does not mean simply a lack of fairness but entails a showing of coercion. *See H.C. Blackwell Company, Inc. v. Kenworth Truck Company*, 620 F.2d at 106 (5th Cir.1980) (citations omitted).

In view of this narrow definition, appellant contends that the trial court erred by not granting its motion for judgment notwithstanding the verdict on the ground that there was insufficient evidence for the jury to conclude that Kenworth failed to act in good faith in terminating the Carroll dealership.[1]

In determining the propriety of a j.n.o.v. we[2] must consider all the evidence in the light most favorable to the party opposed to the motion. *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969). "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper." *Id.* at 374–75.

■ As important as the right to a jury trial is to our judicial system, a party is not entitled to have his case presented to a jury when his case is supported by a mere scintilla of evidence. Indeed, to create a jury question[3] there must be a conflict in substantial evidence.

---

1. Appellant does not concede that it terminated the Carroll dealership but insists that Carroll resigned voluntarily. We believe the jury reasonably could have concluded that Carroll was terminated.

2. The standard is the same on appeal as before the district court. *H.C. Blackwell Company, Inc.*, 620 F.2d at 106 (citations omitted.)

3. Appellee argues that where the existence of "intangible concepts" such as good faith and bad

faith are the subject of factual determination by the jury, the sanctity of the jury's findings are particularly compelling. Appellee, however, brings to our attention no authority to support this proposition, and we decline to so limit our review for fear that to do so would come too close to usurping effective appellate review in numerous other instances which can likewise be labeled as involving "intangible concepts."

The trial court, in rejecting appellant's motion for j.n.o.v., cites *H.C. Blackwell Co., supra,* for the proposition that the issue of Kenworth's bad faith is a factual determination for the jury. The court quotes from the former Fifth Circuit opinion to the effect that "Whether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure on a dealer is a factual question, the determination of which will depend on the circumstances arising in each case."

Just as the existence of good faith is to be determined by the jury on a case by case basis, the existence of evidence sufficient to create a jury question is to be determined by the court on a case by case basis. To say that an issue is a jury question is not to say that the issue should go to the jury in all instances. This proposition, true generally, is equally true in the context of the existence of good faith under the Automobile Dealers' Day in Court Act. Indeed, in *Victory Motors v. Chrysler Motors Corp.,* 357 F.2d 429 (5th Cir.1966), the Fifth Circuit affirmed the grant of a directed verdict in favor of a manufacturer where termination was due to the dealer's consistent failure to meet quota. In doing so, the Court held that testimony that the manufacturer threatened to establish another dealership in an area was not sufficient to create a jury question when the new dealership was not so placed until after the termination and when nothing in the franchise agreement prevented the dealer from establishing another dealership in the region. *Id.* at 432.

In light of *Victory Motors* and a general appreciation of the role of judge and jury in our judicial system, we resist any reading of *Blackwell* which stretches it so far as to make the existence of good faith under the Automobile Dealers' Day in Court Act an issue for the jury in every conceivable instance, regardless of how meager the evidence, or how unsupported the resulting verdict.

With a view to a case by case approach for determining sufficiency of evidence to create a jury question, we turn now to the evidence presented at trial. Appellee cites as evidence of bad faith:

(1) An arbitrary quota which did not take into account local conditions and which Kenworth knew Carroll could not meet;

(2) Kenworth's offering a one year contract on the ostensible basis of poor sales performance despite the fact that a three year renewal term had been offered in past years when Carroll failed to make quota;

(3) Kenworth's violating its own internal policies and explicit terms of Alabama Dealer's Act by giving one year renewal only six days before expiration of current agreement; and

(4) The overall circumstances of Carroll's constructive termination.

Of these alleged pieces of evidence of bad faith, we consider in detail only appellant's quota system.

Appellant argues that its quota system is not evidence of bad faith since it is very similar to the quota system upheld in *Victory Motors* in that both were based on registration of new vehicles in a dealer's assigned territory. Appellee counters by arguing that Kenworth's quota computation failed to give any consideration to local conditions and was not uniformly applied, whereas the quota in *Victory Motors* took into account "local conditions, revisions in direct dealer sales locality description, the recent trend in direct dealer sales performance, and other factors, if any, directly affecting sales opportunity." Appellee's Br. at 26.

In response, appellant notes that the contract in *Victory Motors* said the quota *may* be changed based on several factors, but the opinion indicates the quota was not in fact altered because of these factors, thus, making the quota system there identical to the one used by Kenworth.

Moreover, appellant argues that the similarities between the two cases go even deeper in that *Victory Motors'* primary argument was that Chrysler's quota system failed to take into account an alleged recession in the Savannah area during 1960–61. The old Fifth Circuit rejected this

argument, pointing out that "the formula is self adjusting to take into consideration such situations," because any recession would be reflected in a drop in total registrations. *Victory Motors, supra* at 431–32. Kenworth insists that its quota system is likewise self-adjusting to take into account local economic conditions.

Appellee also argues that the quota system was applied to it selectively. If by that appellee means to argue that it is bad faith not to terminate all dealers who fail to reach quotas we reject that argument. *See, e.g., Clifford Jacobs Motors, Inc. v. Chrysler Corporation,* 357 F.Supp. 564, 575 (S.D.Ohio 1973); *Zebelman v. Chrysler Corporation,* 299 F.Supp. 653, 658 (E.D. Mo.1968).

As to the nature of Kenworth's quota, we agree with appellant. We find no substantive difference between the two quota systems. Furthermore, we find nothing coercive or inherently arbitrary about Kenworth's system for establishing quotas for its dealers and thus do not find its existence or application to Carroll evidence of bad faith.

Once it is determined that the quota is reasonable, failure to meet quota provides sufficient justification for termination, ab-

sent evidence of an ulterior motive.[4] *See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir.1971).

In *York Chrysler-Plymouth, Inc.,* the dealership was terminated ostensibly because of its poor financial condition. The jury, however, was presented with evidence of a motive for the termination other than the dealer's financial condition.[5]

Similarly, the jury in *Marquis v. Chrysler Corporation,* 577 F.2d 624 (9th Cir. 1978), was presented with evidence of a motive for a dealer termination other than the articulated motive of failure to meet quota. The dealer presented evidence that the real reason for its termination was Chrysler's desire to establish a company-owned dealership on land which Chrysler owned already, and that failure to meet quota, or Minimum Sales Responsibility was a mere pretext. Indeed, the Court stated:

> We hold only that on these facts, where the dealership operated at sub-MSR, for a considerable period, during which the sales requirement consistently was treated as a goal, *and where there is evidence that termination was motivated by other reasons,* the dealer's failure to establish MSR does not by itself

---

**4.** We decline to go as far as appellant would like. Appellant argues that the existence of legitimate grounds for termination, such as failure to make quota, shields a manufacturer from a violation of the Automobile Dealers' Day in Court Act.

**5.** At trial, the plaintiff presented a theory that Chrysler Motors wanted a high volume Chrysler Plymouth dealership in the Mobile area without regard to the advantage or disadvantage of the dealer or that the most expeditious way to do this was to establish a Dealer Enterprise Plan. Under the Dealer Enterprise Plan, Chrysler Corporation provides as much as 75% of the dealership's required capital, taking preferred stock in the dealership corporation in exchange. The dealer contributes a minimum of 25% of the capital, taking common stock in exchange. The preferred stock is gradually retired out of the profits of the business, so the individual dealer eventually becomes sole owner. Until the preferred stock is retired, however, Chrysler Motors controls the dealership's board of directors:

> In 1964, a representative of Chrysler Motors Corporation approached the Yorks with the proposition that they move their business

from its downtown location to the new "automobile row" being developed on the outskirts of Mobile. The Yorks agreed to this suggestion, and on October 21, 1964, they entered into a Dealer Relocation Agreement with Chrysler Motors. This agreement contemplated that Chrysler Motors would buy land and construct a new facility which would then be leased to the dealership corporation.

> There were two other significant occurrences in 1964. First, the Yorks became short of working capital and had to obtain from Commercial Credit Corporation a three month moratorium on the $70,000 loan which had been taken out in connection with purchase of the dealership. Second, Chrysler Motors Corporation performed a "Dealership Survey," which pointed out that the cash flow position of the dealership was precarious. The survey recommended, among other things, that the capital loan with Commercial Credit be renegotiated. The Yorks declined, however, to take this step.

establish that sales performance was so poor that termination could not violate the Act.

*Marquis*, at 633.

Our thorough review of the record here reveals no evidence of an ulterior motive for terminating Carroll, such as was present in *Marquis*, and *York Chrysler Plymouth.*

Appellee argues that Kenworth was "overdealered" in Alabama, and that this, rather than failure to meet quota, was the real reason for its termination. There is, however, no evidence to support this theory advanced by counsel for appellee. Nothing in the record suggests that Kenworth considered itself overdealered in Alabama. Even if there were a modicum of evidence to suggest that Kenworth did consider itself overdealered, there is no evidence that this, rather than a poor sales record, motivated Kenworth to terminate Carroll's dealership.

■■■■ In short, we find no evidence of bad faith in its restricted meaning under the Automobile Dealers Day in Court Act.[6] If such bare facts as these are held to be sufficient to create a jury question on the issue of good faith as defined in the statute, we see no end to rightfully terminated dealers hauling manufacturers into court in anticipation of a free shot at a jury verdict, even when there is no evidence to support a verdict in their favor. Such a result is altogether inconsistent with the restricted definition of good faith in the Automobile Dealers' Day in Court Act. Accordingly, we find the evidence presented at trial insufficient to support the jury verdict under that statute. We next consider whether the evidence can support a verdict under the Alabama Motor Vehicle Franchise Act.

## II. *Alabama Motor Vehicle Franchise Act*

Like its federal counterpart, the Alabama Motor Vehicle Franchise Act requires that a manufacturer act in good faith when terminating a dealership. Unlike its federal counterpart, however, the Alabama Act defines good faith in a more traditional commercial manner. Good faith under the Alabama Act means: "Honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade as is defined and interpreted in paragraph (1)(b) of Section 7–2–103." § 8–20–3(7), Code of Alabama (1975). Section 7–2–103(1)(b) is the definitional section of Alabama's Uniform Commercial Code. It provides that "'good faith' in the case of .a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

Although Alabama courts have not yet interpreted this statute, a literal reading reveals a more liberal definition of good faith than is found in its federal counterpart. As a federal court interpreting a state statute, it is not our role to pass on the wisdom of a state legislative policy choice. We must accept the decision of the Alabama state legislature to make it easier for terminated dealers to succeed against manufacturers under Alabama law than they can under federal law. We therefore reject appellant's suggestion that the definition of good faith is the same under both statutes. We are all the more unreceptive to this argument in light of appellant's failure to object when the trial court instructed the jury differently under each statute.[7]

■■■■ Under the more liberal Alabama statute, a jury reasonably could conclude

---

**6.** Because we find no evidence of an ulterior motive, we find it unnecessary to discuss in detail the three other points which appellee cites as evidence of bad faith, other than to say that we find them insufficient to support a finding of bad faith under the federal statute.

**7.** The trial court properly instructed the jury that Kenworth's failure to give ninety day notice prior to terminating Carroll could be considered

as bearing on the issue of good faith under the Alabama statute.

Under Alabama law, a dealer has a separate cause of action when the manufacturer fails to give ninety day notice prior to termination. Since appellee failed to include this cause of action in its complaint, the judge instructed the jury that this issue was relevant only to the extent it had a bearing on Kenworth's lack of good faith.

that Kenworth failed to act in good faith. Since the jury rendered a general, rather than a special verdict, we cannot determine whether its verdict is based on a violation of the federal or the Alabama statute. Moreover, since we have concluded that the evidence does not support a verdict under the federal statute, we therefore remand for a new trial, *King v. Ford Motor Co.*, 597 F.2d 436 (5th Cir.1979), under the Alabama statute.

Judgment **REVERSED** and case **REMANDED**.