UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WOOTTON ENTERPRISES, INCORPORATED, a Maryland Corporation,

*Plaintiff-Appellant,*

v.

SUBARU OF AMERICA, INCORPORATED, a New Jersey Corporation,

*Defendant-Appellee,*

and

FUJI HEAVY INDUSTRIES, LIMITED, a Japanese Corporation; SUBARU-ISUZU AUTOMOTIVE, INCORPORATED, a New Jersey Corporation; SUBARU OF AMERICA, INCORPORATED SOUTHEAST REGION, a New Jersey Corporation,

*Defendants.*

No. 01-1408

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-99-810-AMD)

Argued: November 1, 2001

Decided: April 17, 2002

Before WIDENER and MICHAEL, Circuit Judges, and
Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by unpublished opinion. Senior Judge Magill wrote the opinion, in which Judge Widener and Judge Michael joined.

---

## COUNSEL

**ARGUED:** Benjamin T. Riddles, II, WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P., McLean, Virginia, for Appellant. Kathleen A. Ellis, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellee. **ON BRIEF:** Akin Mahmut Alcitepe, WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P., McLean, Virginia, for Appellant. Jeffrey D. Herschman, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

MAGILL, Senior Circuit Judge:

Wootton Enterprises, Inc. ("Wootton"), a Maryland automobile dealership, brought this action against Subaru of America, Inc. ("Subaru"),[1] an automobile distributor, alleging numerous claims arising from a franchise agreement between the parties. Wootton appeals the district court's dismissal of a number of its claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and the district court's final order granting summary judgment to Subaru. For the reasons stated below, we affirm.

---

[1]Wootton's original and First Amended Complaint named Subaru, Fuji, Subaru-Isuzu Automotive, Inc., and the Southeast Region of Subaru of America, Inc., a division of Subaru, as defendants. Prior to the filing of Wootton's Second Amended Complaint, Defendants Fuji, Subaru-Isuzu, and the Southeast Region were dismissed. Thus, Subaru is the sole defendant in this action.

I. *Factual Background*

The facts of this case are set forth in some detail in the district court's opinion. *See Wootton Enters., Inc. v. Subaru of Am., Inc.*, 134 F. Supp. 2d 698 (D. Md. 2001). We will highlight them here as necessary to our discussion.

David W. Wootton has operated Wootton as a family-owned automobile dealership for approximately thirty-three years. Between 1977 and December 2000, Wootton and Subaru were signatories to a series of franchise agreements pursuant to which Wootton operated a Subaru retail outlet in Pasadena, Maryland. Wootton's dealership is located within Subaru's Southeast Region, District 10, and is one of eleven dealers located in the district.

Sometime around 1995, when Subaru sales were experiencing a nationwide decline, the manufacturer of Subarus made a strategic decision to enter the all-wheel-drive market. To reflect this manufacturing shift, Subaru modified its marketing plans. One such market plan, prepared in 1995, included a recommendation to relocate Subaru's Pasadena dealership (i.e., Wootton's franchise) to Glen Burnie, Maryland. Prior to this litigation, Subaru did not share this report or this particular recommendation with Wootton.

In October 1997, and again in March 1998, representatives from Subaru management met with Mr. Wootton and Ron Lane, general manager of Wootton, to discuss Wootton's sales performance. During both of these meetings, Subaru asked Mr. Wootton if he was interested in voluntarily relinquishing his Subaru franchise. In both instances, Mr. Wootton refused. Following the March 1998 meeting, General Manager Lane wrote Michael Rusnak, Subaru's market development manager, raising numerous concerns about Subaru's treatment of Wootton and requesting from Subaru various information. Subaru Southeast Regional Vice President H.H. Purcell responded to General Manager Lane's letter with an invitation for Mr. Wootton and General Manager Lane to come to Subaru's regional headquarters in Atlanta to discuss their concerns.

On May 12, 1998, the parties met in Atlanta and discussed Wootton's performance and facilities as well as Subaru's ability to assist

Wootton. Subaru confirmed the issues discussed and the agreements reached during this meeting in a letter dated May 13, 1998 (the "Letter"). According to the Letter, Wootton committed (1) to undertake a significant up-grade and improvement of its current facility, (2) to strive to capture 55-60% of the Subaru business sold within its Area of Responsibility,[2] and (3) to continue its management focus on training to improve customer handling. In addition, the Letter states that Mr. Wootton confirmed during the meeting that Wootton's sales goal was fifteen units per month and that this goal was reasonable. Mr. Lane, however, denies that he or Mr. Wootton ever made this last representation.[3]

The Letter also outlines the commitments Subaru made to Wootton. Specifically, Subaru promised Wootton: (1) to provide it with an additional five vehicles from the next allocation pool to ensure sufficient inventory on a going forward basis to sell fifteen units per month, (2) to install a sign, (3) to provide advertising/promotion recommendations, and (4) to be consistent in its support of Wootton's efforts to accomplish its sales objectives. Finally, in the closing paragraph of the Letter, Subaru states that Wootton's task is to sell, at a minimum, fifteen units per month and Subaru "will put [Wootton] in a position to accomplish that task." In closing, however, the Letter states, "The ultimate success of that accomplishment is in [Wootton's] hands."

Following the meeting, on June 19, 1998, Wootton entered into its final franchise agreement with Subaru, effective as of March 1, 1998, for an additional two-year term (hereinafter the "1998 Franchise Agreement"). The 1998 Franchise Agreement consists of three interrelated documents: (1) a nonexclusive Dealership Agreement, which

---

[2]The franchise agreement between Wootton and Subaru assigns Wootton a primary market, or "Area of Responsibility," which encompasses several United States postal zip codes within the Baltimore-Anne Arundel County areas of Maryland.

[3]Because Wootton acknowledged that it received and read the Letter but did nothing to refute it, the district court concluded, as a matter of law, that a 1998 sales objective of fifteen vehicles per month was reasonable and specifically agreed to be so by Wootton. *Wootton*, 134 F. Supp. 2d at 709.

expressly incorporates (2) the Subaru Standard Provisions, which in turn incorporates (3) the Dealer National Operating Standards Manual. The 1998 Franchise Agreement set Wootton's "Planning Volume"[4] at 245 vehicles per year. Pursuant to the Standard Provisions, Subaru is to allocate its new vehicles equitably among its dealers using factors such as inventory levels and sales performance.

After executing the 1998 Franchise Agreement, Wootton's sales performance briefly improved and Subaru fulfilled its promises to install a sign and provide Wootton with an additional five vehicles. In September 1998, however, Wootton's sales began to decline and continued to be well below fifteen vehicles per month through February 1999. Wootton filed this lawsuit in March 1999. While this litigation was pending, the 1998 Franchise Agreement was extended by the parties through December 31, 2000. Wootton sold its Subaru Dealership, with Subaru's consent, to a dealer in Glen Burnie, Maryland, on December 22, 2000, but continues to operate a Volkswagen franchise at its Pasadena location.

## II. *Procedural Background & Issues on Appeal*

On March 23, 1999, Wootton filed its original complaint in the district court. The next day, Wootton filed a First Amended Complaint. On August 16, 1999, the district court granted in part and denied in part Subaru's motion to dismiss and ordered Wootton to file a second amended complaint. In its order, the district court ruled that any claims based on facts in existence before the effective date of the 1998 Franchise Agreement were barred because of the valid and enforceable release provision contained in prior agreements. Consequently, Wootton could pursue only those claims arising from Subaru's acts and omissions occurring after the March 1, 1998 effective date of the 1998 Franchise Agreement. This order is not challenged in this appeal.

---

[4]According to Section 2.10 of the Standard Provisions, the term "Planning Volume" means the proportionate number of vehicles which, if sold by Wootton within its Area of Responsibility in a twelve-month period, would equal a market penetration level selected by Subaru as appropriate for the area. Planning Volume, however, is not intended to be a measure of a dealer's sales performance. Standard Provisions, § 2.10.

On September 10, 1999, Wootton filed a Second Amended Complaint ("SAC"),[5] including the following allegations: (1) breach of contract, including fifteen sub-counts; (2) fraud; (3) violation of the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*;[6] (4) violation of Section 15-207(c) of the Maryland Transportation Code; (5) violation of Section 15-207(d) of the Maryland Transportation Code; (6) violation of Section 15-207(e)(2) of the Maryland Transportation Code; (7) intentional interference with prospective economic advantage; (8) violation of the Robinson-Patman Act, 15 U.S.C. § 13(b); and (9) violation of the Maryland Antitrust Act, Md. Code § 11-204(a)(4). On September 27, 1999, Subaru filed a motion to dismiss Wootton's SAC for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On March 17, 2000, the district court granted in part and denied in part Subaru's 12(b)(6) motion.

After the district court's March 17, 2000 ruling, the following claims remained: (1) seven of the fifteen material breaches of contract allegations; (2) fraud; and (3) violations of the ADDCA and its Maryland counterpart, but only with respect to the alleged demands by Subaru that Wootton meet unattainable sales objectives when read in conjunction with Subaru's alleged threats to terminate Wootton's franchise or take Wootton to court.

On June 28, 2000, Wootton filed a motion to compel the production of documents. The district court denied this motion, without prejudice, on July 18, 2000. On August 28, 2000, Subaru filed a motion for summary judgment. On February 28, 2001, following a motion hearing and supplemental briefing from both parties, the district court granted summary judgment for Subaru on all of Wootton's remaining counts. *See Wootton*, 134 F. Supp. 2d 698.

On appeal, Wootton contends that the district court erred in granting summary judgment on its claims alleging: (1) breach of contract,

---

[5]Wootton's SAC spans some 52 pages, including 149 paragraphs, and nine separately stated counts, most with "sub-counts" and "sub-sub-counts."

[6]The fifteen sub-counts of Wootton's breach of contract claim serve as the basis for Wootton's ADDCA claim.

including claims alleging (i) the delayed shipment of vehicles, SAC, ¶¶ 101(c) and (d), (ii) the setting of unattainable sales objectives and withholding of inventory, SAC, ¶ 101(h), (iii) the failure to provide information, SAC, ¶ 101(j), and (iv) the making of repeated threats of termination, SAC, ¶¶ 101(k), (l), and (m); (2) fraud in the inducement and in the administration of the contract; and (3) violations of the ADDCA and Maryland Transportation Act.

Wootton also challenges the district court's dismissal of a significant number of its claims pursuant to Rule 12(b)(6). Specifically, Wootton appeals the dismissal of eight of its fifteen breach of contract claims, the dismissal of its claims alleging violations of the ADDCA and Maryland Transportation Code, and the dismissal of its claims alleging violations of the Robinson-Patman Act and Maryland Antitrust Act.

Lastly, Wootton appeals the district court's July 18, 2000 denial of its motion to compel Subaru to produce documents pertaining to the allocation of inventory and sales of Wootton's rival dealerships.

## III. *Summary Judgment*

We review the district court's summary judgment decision de novo, viewing the record in the light most favorable to the nonmoving party, here Wootton. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

Wootton argues that the district court erred in granting summary judgment for Subaru regarding each of the following claims: (1) breach of the 1998 Franchise Agreement in that Subaru delayed Wootton's receipt of inventory, supplied Wootton with inadequate and undesirable inventory, withheld information from Wootton, and threatened Wootton's termination; (2) common law fraud in that Subaru induced Wootton to renew the franchise agreement through the use of false representations about its intentions; and (3) violations of the ADDCA and the Maryland Transportation Code. We have little to add to the extensive and well-reasoned opinion of the district court

granting summary judgment to Subaru and see no need to repeat the district court's thorough analysis. *See Wootton*, 134 F. Supp. 2d 698.

The 1998 Franchise Agreement at issue in this case imposes few clear obligations on Subaru, and the evidence in the record regarding Wootton's breach of contract allegations is insufficient to avoid summary judgment. The one provision in the 1998 Franchise Agreement that does address the delivery of vehicles is a broad exculpatory clause, which "covers all contingencies, foreseen and unforeseen, from acts of God to business mismanagement." *Id.* at 706; *see* Standard Provisions § 10.12. The 1998 Franchise Agreement is essentially silent as to the method whereby Subaru is to allocate vehicles to its dealers. And, the 1998 Franchise Agreement provides Subaru with wide discretion and control over its market information. *See* Standard Provisions § 18.4 (Subaru required to notify dealer of proposed change in market representation plan after conducting market studies, but no requirement that Subaru provide dealer with market study). Finally, Wootton's breach of contract claim based on an allegation of threats of termination is not cognizable because Subaru never did in fact terminate Wootton's dealership.

In alleging that Subaru committed fraud, Wootton argues that in reliance on Subaru's promise to put Wootton in a position to meet its sales goals, it agreed to enter into the 1998 Franchise Agreement.[7] Even assuming arguendo that such a vague promise could be enforced, Wootton's claim fails because Wootton failed to establish that its reliance on this "promise" was justified. *See VF Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188, 193 (Md. 1998) (prima facie case of fraud requires plaintiff to prove that he relied on misrepresentation and reliance was justified). Subaru's alleged "promise" was not an insurance policy for Wootton's success. In the May 13, 1998 Letter, Subaru explicitly warns Wootton that "[t]he ultimate success of [accomplishing your sales goal] is in your hands." Thus, it was not reasonable for Wootton to assume otherwise.

Finally, an automobile dealer may bring suit under the ADDCA or

---

[7]The "promise" on which Wootton allegedly relied is contained in the May 13, 1998 Letter.

the Maryland Transportation Act[8] when the automobile manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." 15 U.S.C. § 1222 (1994). "Good faith" is defined as "the duty . . . to act in a fair and equitable manner . . . so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e) (1994).

In *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 55-56 (4th Cir. 1974), we construed good faith under the ADDCA to mean more than mere unfairness in that it "must be determined in the context of actual or threatened coercion or intimidation." For purposes of the ADDCA, only when a manufacturer's conduct amounts to actual or threatened coercion or intimidation does a manufacturer fail to act in good faith. *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 336 (4th Cir. 1986). Moreover, "coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance." *Colonial Dodge,*

---

[8]The analysis under the Maryland Transportation Act is substantially the same as the analysis under the ADDCA. *See, e.g.*, *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F. Supp. 2d 737, 744 (D. Md. 1996), *aff'd*, 121 F.3d 697 (4th Cir. 1997) (coercion under both the state statute and the ADDCA embody same concept and same analysis applies); *Cemar, Inc. v. Nissan Motor Corp.*, 713 F. Supp. 725, 730 (D. Del. 1989) (same analysis applies to ADDCA and Maryland Transportation Act claims); *Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*, 699 A.2d 1209, 1219 (Md. Ct. Spec. App. 1997) ("concept of coercion [under Maryland Transportation Act] similar to that utilized in the [ADDCA]"). In addition, the Maryland Transportation Act defines coercion and lack of good faith using the same terms as the ADDCA. *Compare* Md. Code Ann., Transp. § 15-207(a)(2)(ii) ("'Coerce' does not include to argue, urge, recommend, or persuade"), *with* 15 U.S.C. § 1221(e) ("[R]ecommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute lack of good faith.").

*Inc. v. Chrysler Corp.*, 11 F. Supp. 2d 737, 743 (D. Md. 1996), *aff'd*, 121 F.3d 697 (4th Cir. 1997).[9]

After reviewing the entire record, we are drawn to the same conclusion as the district court: "[E]ven if Subaru threatened termination, such threats were not causally related to any wrongful act or demand." *Wootton*, 134 F. Supp. 2d at 717. Thus, we find no reversible error in the district court's well-reasoned opinion granting summary judgment to Subaru.

## IV. *Motion to Dismiss*

We review dismissals for failure to state a claim de novo, taking the facts as stated in the complaint as true. *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001). This court should not affirm a Rule 12(b)(6) motion unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (internal citations omitted).

In its SAC, Wootton identifies fifteen (excluding sub-parts) alleged material breaches of the 1998 Franchise Agreement by Subaru. In its March 17, 2000 Order, the district court dismissed, pursuant to Rule 12(b)(6), eight of these claims. On appeal, and at oral argument, Wootton essentially challenges the district court's dismissal of two of these claims: ¶ 101(a) of its SAC alleging that Subaru engaged in an unfair, discriminatory, and anti-competitive allocation of new vehi-

---

[9]The majority of our sister circuits have adopted the wrongful demand requirement. *See Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 796 (7th Cir. 1989) (failure to act in good faith "requires a wrongful demand enforced by coercion or intimidation"); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1379 (10th Cir. 1988) (same); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 95-96 (2d Cir. 1987) (same); *Wallace Motor Sales, Inc. v. Am. Motor Sales Corp.*, 780 F.2d 1049, 1056 (1st Cir. 1985) (same); *Am. Motor Sales Corp. v. Runke*, 708 F.2d 202, 207 (6th Cir. 1983) (same); *H.C. Blackwell Co. v. Kenworth Truck Co.*, 620 F.2d 104, 107 (5th Cir. 1980) (same); *Francis Chevrolet Co. v. Gen. Motors Corp.*, 602 F.2d 227, 229 (8th Cir. 1979) (same); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir. 1978) (same); *Rea v. Ford Motor Co.*, 497 F.2d 577, 585 (3d Cir. 1974) (same).

cles scheme; and ¶ 101(b) of its SAC, alleging that Subaru afforded an unfair, unmerited, and anti-competitive advantage to Wootton's competitors by providing Wootton's competitors with a larger quantity of inventory including the choicest selling models and colors.

Wootton strenuously argues in its brief and at oral argument that this discriminatory allocation is evidenced by the fact that in May and June 1998, Annapolis Subaru, one of Wootton's competitors, had more vehicles on its lot than Wootton did, an allegation that Wootton claims it sufficiently plead in its SAC. The district court, however, concluded that this allegation fails to state a claim upon which relief may be granted because, even if such an allegation was proven true, the fact that Wootton's competitor had more vehicles than Wootton at specific points in time fails to allege any allegations, that if proven, would establish that Wootton was entitled to receive more vehicles than its competitors in light of Wootton's "inventory levels and sales performance." In other words, the district court found that because Wootton alleged no factual basis for a claim that it was not treated on "proportionately equal terms" as its competitors, its breach of contract claims alleging inequitable distribution of inventory failed to state a claim upon which relief may be granted.

Even if we were to assume arguendo that Wootton's SAC, which alleges that Annapolis Subaru had more vehicles on its lot in May and June 1998 than Wootton did, was sufficient to state a claim upon which relief could be granted,[10] we nevertheless find no reversible error. The heart of Wootton's complaint is that it received an unfair allocation of vehicles both in relation to its sales objectives (i.e., SAC, ¶ 101(a)) and its competitors (i.e., SAC, ¶ 101(b)). In arguing that these "unfair" allocations were a breach of contract, Wootton must rely on Section 11.3 of the Standard Provisions, which requires Subaru to allocate its products "equitably," using such factors as prior "inventory levels and sales performance."

Wootton's first claim that it received an unfair allocation of vehicles in relation to its sales objectives (i.e., SAC, ¶ 101(a)), which was dismissed by the district court pursuant to Rule 12(b)(6), was actually

---

[10]We need not reach this question, however, and therefore express no opinion on this issue.

extensively litigated by the district court at the summary judgment stage. In particular, the district court's analysis of Wootton's unfair allocation of vehicles claim spans some four pages and concludes that Wootton failed to demonstrate that it received anything other than the inventory to which it was entitled to receive under the 1998 Franchise Agreement based on Wootton's past sales and inventory levels. *Wootton*, 134 F. Supp. 2d at 707-11. Thus, even though the district court dismissed Wootton's unfair allocation claim (i.e., SAC, ¶ 101(a)) at the 12(b)(6) stage, this claim remained at the center of Wootton's complaint and was fully litigated at the summary judgment stage. Finding no error in the district court's conclusion that Wootton received the number of vehicles that it was entitled to receive, we find no reversible error.

For similar reasons, we find no reversible error in the district court's Rule 12(b)(6) dismissal of Wootton's second claim that it received an unfair allocation of vehicles in relation to its competitors (i.e., SAC, ¶ 101(b)). In particular, under the terms of the 1998 Franchise Agreement, the only way in which Wootton's claim that it received fewer vehicles than its competitors could be sustained would be if Wootton were able to demonstrate that it received fewer vehicles than it was entitled to receive, while its competitors received more vehicles than they were entitled to receive. Thus, this claim leads us right back to the same question that Wootton was afforded the opportunity to litigate, i.e., did Wootton receive all of the vehicles to which it was entitled under the 1998 Franchise Agreement. Because Wootton failed to demonstrate that it was entitled to receive more vehicles than it actually received, it is irrelevant whether Wootton was afforded the opportunity to litigate the question whether Wootton's competitors received more vehicles than Wootton. Even if Wootton had been afforded the opportunity to demonstrate that its competitors received more vehicles than it did, Wootton remains unable to demonstrate actual injury because it received all of the vehicles to which it was entitled. Thus, even if the district court's decision to dismiss Wootton's claim alleging that it received fewer vehicles than its competitors at the 12(b)(6) stage was in error, any error was harmless. *See* Fed. R. Civ. P. 61 (no error or defect in any ruling or order, or in any action by the court, is grounds for disturbing a judgment or order unless failing to do so would be inconsistent with substantial justice).

In addition, having reviewed the record and the district court's opinion, we find no reversible error in the district court's decision dismissing Wootton's numerous other claims for failure to state a claim upon which relief may be granted. Finally, we find that the district court did not abuse its discretion regarding the scope of discovery or in denying Wootton's motion to compel. *See Wells v. Liddy*, 186 F.3d 505, 518 n.12 (4th Cir. 1999).

## V. *Conclusion*

For the foregoing reasons, we affirm the judgments of the district court in all respects.

*AFFIRMED*