597 F.2d 436
 4 Fed. R. Evid. Serv. 512
 James H. KING and Hazel King, husband and wife, Plaintiffs-Appellees,
v.
FORD MOTOR COMPANY, a Delaware Corporation,
Defendant-Third-Party Plaintiff Appellant,
v.
FLXIBLE SOUTHERN COMPANY, INC., a corporation, Third-Party Defendant.
 No. 76-2528.
 United States Court of Appeals, Fifth Circuit.
 June 20, 1979.
 
 Michael D. Knight, Mobile, Ala., for Ford Motor Co.
 Wm. D. Melton, Evergreen, Ala., Richard Bounds, Mobile, Ala., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before RONEY, TJOFLAT and HILL, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 In this diversity action, James and Hazel King, pursuant to a general verdict returned by a jury, recovered a $350,000 judgment against Ford Motor Company (Ford) for personal injuries suffered by Mr. King due to the malfunction of a motor vehicle chassis manufactured by Ford. In this appeal, Ford asks us to find that none of the plaintiffs' several theories of liability was established by the evidence and to direct the district court to enter a judgment notwithstanding the verdict. If a judgment n. o. v. is not in order, Ford seeks a new trial on three independent grounds: (1) the evidence is insufficient to support each of the plaintiffs' theories of liability; (2) the amount of the verdict is excessive; and (3) the district court committed reversible error by refusing to admit photographs of the Ford chassis into evidence. For the reasons set forth below, we reject Ford's arguments and affirm.
 
 
 2
 * James King was formerly employed by the Flxible Southern Corporation, Inc. (Flxible) in its Evergreen, Alabama plant.[1] Flxible was in the business of purchasing partially completed chassis from the major motor vehicle manufacturers, including Ford and General Motors Corporation, constructing truck or van bodies over the chassis, and selling the completed vehicles to various purchasers. King worked on the Flxible assembly line where the incomplete chassis were converted into the finished product.
 
 
 3
 On October 4, 1974, King had become ahead in his work, so he left his assigned job station in order to help Allen Miller, a co-worker stationed directly behind him on the assembly line. Meanwhile, John Rudolph, another co-worker, was installing wiring and electrical systems in a Ford chassis (the Rudolph chassis) at the station immediately in front of King's. In order to test the effectiveness of his work, Rudolph attached the battery cables to the battery of the Rudolph chassis; as a rule, on the assembly line the cables were kept detached. The chassis motor suddenly began operation and the chassis lurched to the rear, striking the one at King's station. This chassis in turn moved to the rear, pinning King between it and the chassis at Miller's station. King thereby suffered the injuries that gave rise to this suit.
 
 II
 
 4
 We first consider Ford's contention that the proof failed to establish that the accident was caused by some fault of Ford. Since the jury returned a general verdict, to be entitled to a judgment n. o. v. Ford must demonstrate that the plaintiffs failed to make out a case under any of their alternative theories of liability. To entitle it to a new trial, however, Ford need only show that the evidence is insufficient to support one of the plaintiffs' theories.[2]
 
 
 5
 In diversity cases in this circuit, a district court applies the federal, rather than the state, standard for determining whether a party's evidence is sufficient to defeat a motion for a directed verdict or judgment n. o. v. Boeing Co. v. Shipman, 411 F.2d 365, 368 (5th Cir. 1969) (en banc). Under that standard,
 
 
 6
 the Court should consider all of the evidence not just that evidence which supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. . . . (I)t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 7
 Id. at 374-75 (footnote omitted). In our view, the court below correctly found that reasonable men might disagree concerning the cause of the accident and that it was within the jury's province to resolve the issues presented by each theory of the plaintiffs' case.
 
 
 8
 Several credible witnesses testified that at the time of the accident the ignition of the Rudolph chassis was turned off and the automatic transmission was set in park. Thus, when the battery was connected the vehicle should not have started and moved in reverse; both the ignition sequence and the transmission had to be defective for this accident to occur. At trial, testimony was offered by the plaintiffs to show that the chassis's solenoid (starter relay) was defective, thereby causing the chassis to start even though the ignition was turned off, and that the transmission was misaligned so that it was in reverse when the transmission indicator pointed to "P" (park). Ford disputed the testimony that the solenoid was defective and argued that any misalignment of the transmission occurred on Flxible's assembly line, not at the Ford factory.
 
 
 9
 The district court charged the jury that the Kings could recover against Ford if the accident were proximately caused by any one of the following: (1) a Rudolph chassis manufactured and sold by Ford to Flxible with (a) a defective solenoid or (b) a misaligned transmission; (2) Ford's negligent inspection of the Rudolph chassis; (3) a transmission whose misalignment occurred on Flxible's assembly line because Ford negligently failed to warn Flxible that its assembly line procedures could cause such misalignment; or (4) Ford's breach of an implied warranty that the Rudolph chassis was fit for the ordinary purpose for which it was sold.[3] We now discuss the sufficiency of the evidence supporting the alternative theories of liability that were submitted to the jury. In doing so, we concentrate on the evidentiary deficiencies cited to us by Ford.
 
 
 10
 A. The Defective Solenoid.
 
 
 11
 Soon after the accident, Edward Tatum, the service manager for the Ford dealership in Evergreen, was asked by Flxible to inspect the Rudolph chassis.[4] Tatum had considerable training and experience in the operation and maintenance of Ford vehicles and was familiar with the type of vehicle involved in the accident. Tatum testified as an expert witness on behalf of the plaintiffs. He stated that when he inspected the Rudolph chassis[5] and hooked the cables to a fully charged battery, the chassis starter engaged the flywheel, thereby turning the engine even though the ignition was in an "off" position. Record, vol. II, at 177. Tatum therefore concluded that the chassis's starter solenoid was defective. A new solenoid ordinarily should last until its vehicle is driven from thirty to forty thousand miles. Tatum pointed out, however, that "a particular solenoid unit that is exposed to weather, for instance, is subject to collect moisture in that unit, therefore causing corrosion" and creating a direct connection through the solenoid unit. Id. at 195-97. A direct connection, Tatum explained, could cause the defective ignition system he found on the Rudolph chassis; his opinion was that such had occurred in this case. Id. at 197. He felt that the defect might manifest itself only occasionally, however; the solenoid "might have worked two or three, or four or five or a half a dozen times, and all of a sudden it could happen, could have made its contact." Id. at 219. Tatum was confident about his testimony even though he never examined the interior parts of the solenoid in question. Tatum's opinion was buttressed by Fred Weinheimer, Ford's district service engineer, who agreed that corrosion caused by exposure to weather could cause a solenoid to malfunction, Id. at 334-35, 342-43, and by Earl Sadler, Flxible's supervisor of inspectors, who recalled that when Tatum tested the chassis after the accident, Tatum had to jar the solenoid in order to break the contacts loose because they were sticking. Record, vol. III, at 517-18, 531.
 
 
 12
 With this testimony in the record, there was substantial evidence to warrant jury deliberation of the question whether the Rudolph chassis's solenoid was defective. In reaching this conclusion, we have not overlooked Ford's argument that the "physical facts" doctrine requires a finding that the solenoid was not defective as a matter of law. Under Ford's expression of that doctrine, Tatum's opinion that the solenoid was defective due to corrosion must be completely discounted because there was evidence that an independent physical examination of the Rudolph chassis's solenoid disclosed no such corrosion. In the face of this examination, Ford's argument proceeds, the jury could not have found the solenoid defective because the plaintiffs failed to establish some other cause for the malfunction. Consequently, Ford concludes, every theory of the plaintiffs' case that depends upon the existence of a defective solenoid must fall.
 
 
 13
 The problem with Ford's argument is that the record contains competent, probative evidence that the solenoid was corroded. The physical facts evidence, in our view, consisted of nothing more than the testimony of Ford witnesses who insisted that they saw no signs of corrosion when they examined the solenoid. The conflict between these witnesses and the plaintiffs' expert, Tatum, was plainly one for the jury to resolve.
 
 
 14
 The physical facts were established, Ford says, by the solenoid itself and the testimony of Fred Weinheimer and Robert Dale, a Ford staff engineer. As for the solenoid, it was not shown that its condition at trial was identical to its condition at the time of the accident;[6] therefore, the corrosion-free appearance of the solenoid at trial could not operate alone as conclusive proof, as Ford contends it does, that corrosion played no role in the accident. Weinheimer and Dale said that their examination of the solenoid disclosed no corrosion. Record, vol. II, at 344; Record, vol. III, at 594-98. Weinheimer was the one who removed the solenoid from the Rudolph chassis following the accident; he was the first to open and examine it. Dale made his findings when he examined the part several months later.
 
 
 15
 The weight of these opinions may well have been undermined in the eyes of the jury by the plaintiffs' rebuttal. Charles Salter, a Flxible employee, testified that in a conversation with Weinheimer immediately after Weinheimer examined the solenoid, "I asked him, I said, did you find anything wrong with the old (solenoid) and he said yes, sir, I found rust in it." Id. at 676. Salter was not effectively impeached on this point. The conversation he recounted not only cast some doubt on Weinheimer's opinion that the solenoid was not corroded, but also served to establish that at the time Weinheimer first opened the solenoid rust was present.[7] See Fed.R.Evid. 801(d)(2)(D).
 
 
 16
 In sum, we hold that under the standard of Boeing Co. v. Shipman there was "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions,"411 F.2d at 374; the issue of the defective solenoid was properly submitted to the jury.
 
 
 17
 B. Ford's Negligence and the Defective Solenoid.
 
 
 18
 We think it undisputed that Ford knew that a solenoid exposed to weather might corrode and consequently malfunction. There is ample evidence in the record that Ford chassis, including the solenoids, were routinely exposed to the elements. Upon their manufacture at Ford's Louisville plant, the chassis were stored outside at the plant site for approximately three months. Then, they were transported without protection from the weather to Flxible's plant by way of Birmingham. At Flxible, the chassis continued to be exposed to the elements until they entered the Flxible assembly line. On this evidence, we have no difficulty in concluding that it was for the jury to determine whether the solenoid in question was corroded because Ford negligently left it exposed to the elements for over three months.
 
 
 19
 C. Ford's Negligence and the Misaligned Transmission.
 
 
 20
 Ford vigorously maintains that the Rudolph chassis's transmission was properly aligned when it was delivered to Flxible and that it became misaligned during Flxible's manufacturing process. Ford presented considerable evidence to support its position; the plaintiffs also presented substantial evidence that the transmission was defective when it arrived at Flxible's plant. An obvious jury issue was created.
 
 
 21
 Edward Tatum testified that the Rudolph chassis's transmission was misaligned when he examined it after the accident. The jamnut that holds the transmission linkage in place was tight and undamaged; with the nut tight, he explained, the transmission could not have become misaligned by movement of the steering column, for example, on the Flxible assembly line. Accordingly, Tatum concluded that the transmission was misaligned when the chassis left the Ford factory. Record, vol. II, at 181-83. We are satisfied that this testimony alone was enough to create a jury issue whether the transmission was defective when it left Ford. There was additional proof in support of the plaintiffs' position, however. Calvin Thomas, who drove chassis to the Flxible assembly line, testified that approximately three days prior to King's injury a Ford chassis (the Thomas chassis) moved in reverse while its transmission was set in park. Since it took about three days for a chassis to move down the assembly line from Thomas's station to Rudolph's, one could conclude that the Rudloph and Thomas chassis were one and the same. Id. at 161-63.[8] Finally, Earl Sadler testified that in his opinion the Rudolph chassis's transmission was not altered between its receipt from Ford and King's accident. Record, vol. III, at 528-29.
 
 
 22
 Despite this evidence, Ford nevertheless maintains that the jury was precluded from finding that the transmission was defective when it left Ford's custody. It relies in part on the testimony of Robert Dale and others who said that moving the steering column on a Ford chassis (which frequently took place on Flxible's assembly line) could misalign the transmission. In our judgment, however, this evidence did not foreclose the jury's right to accept Tatum's theory that the tight jamnut prevented a misalignment in this case.[9] Ford also relies on evidence that the Rudolph chassis's transmission functioned properly when the chassis was driven to various locations in Flxible's plant before reaching the assembly line.[10] Ford would have us deduce from this, as a matter of law, that the transmission became misaligned after it was placed on the line.
 
 
 23
 Ford constructs this argument on the testimony of two of its witnesses, Obie Adams and Floyd Griffen, who were the Flxible employees who probably drove the Rudolph chassis from the time it reached Flxible until it entered the assembly line. Neither could recall any difficulty with the transmission. However, their testimony did not preclude the possibility that a misalignment could have gone undetected. Id. at 414-16, 512-13. It was Griffen's job to deliver the chassis to Calvin Thomas, and Thomas placed them on the assembly line. Thomas claimed that the Thomas chassis had a misaligned transmission. It was the jury's function to weigh the testimony of these witnesses. Contrary to Ford's argument, we hold that the jury was entitled to find that the Rudolph chassis's transmission was misaligned when it arrived from Ford and that Adams and Griffen simply failed to discover this fact.
 
 
 24
 D. Ford's Negligent Inspection.
 
 
 25
 In its brief Ford concedes that a manufacturer has a duty to make such tests and inspections, both during and after completion of the manufacturing process, that are reasonably necessary to assure a safe product. As we have already decided that there is substantial evidence to warrant the jury's finding that the solenoid, the transmission, or both were defective when the Rudolph chassis left Ford, the sole remaining question was whether Ford could have discovered such defects through proper inspection. On the basis of our discussion to this point, we think it clear that the jury could decide the question in the plaintiffs' favor.[11]
 
 
 26
 E. Ford's Negligent Failure to Warn.
 
 
 27
 As we have noted, the district court authorized the jury to hold for the plaintiffs if it found that King's injury was proximately caused by Ford's negligent failure to warn Flxible that its assembly line procedure might cause a chassis's transmission to become misaligned.[12] Ford concedes that Flxible's assembly process could have created misalignment (in fact, it introduced substantial evidence indicating as much during its endeavor to establish that the problem with the Rudolph chassis's transmission arose after its delivery to Flxible), but it argues vigorously that it had no duty to warn. This is because, the argument proceeds, it is undisputed that Flxible fully appreciated or should have appreciated the risk that a transmission might become misaligned at Flxible. If the record were to support Ford's contention as to Flxible's knowledge, Ford might well have a point.[13] In our view, however, a jury issue was plainly presented.
 
 
 28
 Ford was well aware that Flxible's assembly line procedures could affect chassis transmissions, Id. at 660-61; Ford's own expert, Dale, testified that "every unit that came out of Flxible Southern could be out of adjustment by virtue of their assembly procedures." Id. at 666. Several witnesses stated that Flxible was never warned about this problem by Ford. Id. at 490, 530. Fred Weinheimer, Ford's own district service engineer, testified that Ford "should be telling somebody about (the potential misalignment on Flxible's assembly line)." Record, vol. II, at 336-37.
 
 
 29
 Ford seeks to relieve itself of the obligation to warn by pointing to specific evidence that Flxible knew of the potential for misalignment on its assembly line. On several occasions prior to the accident, transmissions were found to be out of alignment. Id. at 372-73. Calvin Thomas encountered a defective transmission three days before the mishap and failed to notify anyone at Flxible. Despite the occurrence of episodes such as this, however, we are unable to say as a matter of law that Flxible's knowledge became so incontrovertible that Ford no longer was obligated to warn. The jury was entitled to weigh the evidence on this point. It was the jury's province to decide the extent and quality of Flxible's knowledge and whether Ford's duty had ceased to exist.
 
 
 30
 F. Ford's Breach of Implied Warranty.
 
 
 31
 Although Ford failed in its brief to take issue with the propriety of the plaintiffs' breach of warranty claim, we consider it tacitly raised by its claim that a judgment n. o. v. should be entered. Ford apparently concedes that an implied warranty of fitness existed and would only maintain that this warranty was not breached. We have already held that the jury could find that the chassis had a defective solenoid or transmission. Accordingly, the jury could conclude that the chassis was unfit and the implied warranty breached.
 
 III
 
 32
 Ford claims that the $350,000 verdict awarded to the Kings is excessive by some $30,000. We cannot agree. Before we will set aside the verdict we must
 
 
 33
 see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause . . . (or) the damages allowed are so excessive as to warrant the belief that the jury must have been misled by some mistaken view of the merits of the case . . . .
 
 
 34
 Vest v. Gay, 275 Ala. 286, 154 So.2d 297, 298 (1963) (citations omitted). In this case King has suffered fractures to both legs. The fracture to the right leg extended into the knee joint, requiring the surgical implantation of a pin and a lengthy hospitalization and convalescence. Future surgery may be necessitated following the onset of traumatic arthritis in the knee joint. He is now functionally unemployable. His life expectancy is over twenty years. King is no longer able to assist his wife, who is crippled by arthritis, in work around the home, so they must depend upon neighbors and relatives for assistance. The jury was properly instructed to calculate damages for medical expenses, loss of earnings, impairment of future earnings, physical pain and suffering, mental anguish, permanent injuries and disabilities, and loss of consortium. Record, vol. III, at 771, 775. It fairly did so, and we refuse to overturn its verdict.
 
 IV
 
 35
 Having decided that the evidence was sufficient for the submission to the jury of each theory of the plaintiffs' case, we now turn to Ford's argument that the court erred in excluding certain photographs from evidence. The disputed photographs were of the Rudolph chassis and were taken after Flxible had manufactured it into a panel truck. Ford offered them in an attempt to show the jury how various parts of the Rudolph chassis appeared. The district court refused to admit them because they did not depict the Rudolph chassis as it existed at the time of the accident but showed instead a completed vehicle that differed considerably from the chassis's appearance when the accident occurred. The court applied Fed.R.Evid. 403 and balanced "the probative value of and need for the evidence against the harm likely to result from its admission." Advisory Committee Notes to Rule 403, 28 U.S.C.A. Rules of Evidence at 102 (West 1975). After an extensive and exhaustive consideration, which occupies over forty pages of the record, Id. at 438-80, the court concluded that the photographs might confuse or mislead the jury to the prejudice of the plaintiffs. The court's ruling was by no means an abuse of its broad discretion under rule 403, and we refuse to disturb it by granting a new trial.[14] See United States v. Johnson, 558 F.2d 744, 746-47 (5th Cir. 1977).
 
 V
 
 36
 We have rejected each of the arguments Ford has advanced in this appeal. The district court was correct in denying the alternative motions for judgment n. o. v. and new trial. Accordingly, the judgment is
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Flxible was named by Ford as a third party defendant to this action, but the district court granted Flxible's motion to dismiss Ford's third party complaint on September 5, 1975. Record, vol. I, at 91. Ford has not appealed this ruling
 
 
 [2]
 We are unable to tell from the record whether the parties or the district court considered submitting this case to the jury for a special verdict rather than the mere general one it employed. See Fed.R.Civ.P. 49(a). The court was presented with complicated issues of fact and a number of alternative theories of liability; consequently, it was a case ideally suited for such treatment. See, e. g., Mixon v. Atlantic Coast Line R.R., 370 F.2d 852, 860-62 (5th Cir. 1966) (Brown, C. J., concurring); Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 245, 338 (1967)
 
 
 [3]
 At this point we note that the court below held two charge conferences, both of which were off the record. Record, vol. III, at 537, 683. Then, after instructing the jury, it stated that
 I now make a part of the record all objections and reservations to the charge made in the several charge conferences, as if the same were set forth at this time in the record. Other than those that are already made a part of the record, does either side have any objections or reservations to the charge?
 Id. at 778-79. Neither party made any further objections or requested additional instructions; nor did they seek to place in the record any objections or charge requests previously made off the record. Id. at 779. The procedure of holding off-the-record charge conferences and failing to reflect what transpired is, we think, in clear violation of the spirit of Fed.R.Civ.P. 51, which provides in pertinent part that "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Obviously, we cannot consider off-the-record objections to jury instructions not subsequently made part of the record; the district court's purported entry of such objections onto the record in this instance has turned out to be illusory. Although the parties have facially avoided this problem by not questioning here the court's rulings in fashioning the final charge to the jury (part of Ford's motion for new trial Is based upon the court's giving one charge and refusal to give certain other instructions), we would have been aided in our review by a complete record.
 
 
 [4]
 David Stonestreet, a chassis manager at Flxible, testified that shortly after the accident he telephoned the Ford plant in Louisville, Kentucky, where the Rudolph chassis was manufactured, and spoke with Jerry Wright of Ford's Quality Control Department. Wright told Stonestreet to contact the Evergreen Ford dealer in order to have someone from Ford examine the Rudolph chassis. Edward Tatum examined the chassis after the Evergreen Ford dealer was contacted by Flxible. Record, vol. II, at 228-32
 
 
 [5]
 There was some dispute whether the chassis Tatum examined after the accident was in fact the Rudolph chassis. All of the chassis involved in the accident were removed from the Flxible assembly line and stored together; all were facially identical to the Rudolph chassis. Tatum testified that "when I arrived at the scene, (Flxible personnel) showed me the unit that had the problem." Record, vol. II, at 176. He then studied that chassis. David Stonestreet of Flxible testified that to the best of his knowledge Tatum in fact examined the Rudolph chassis, but that Stonestreet did not check the Flxible serial number for the Rudolph chassis against the number of the chassis Tatum examined. Id. at 231-34. Earl Sadler, Flxible's supervisor of inspectors, testified that he did check the serial number and that Tatum did not examine the Rudolph chassis. Record, vol. III, at 516-17. On its face Sadler's testimony would clearly establish that Tatum inspected the wrong chassis and thus that his testimony was irrelevant. However, Tatum also testified that he repaired the misaligned transmission on the chassis he examined. Record, vol. II, at 181-82. Fred Weinheimer, Ford's district service engineer, testified that he went to the Flxible plant in early December 1974 and examined four allegedly defective chassis which were together on the Flxible assembly line at the time of the accident. One of them was the Rudolph chassis. He checked the serial numbers of each of these chassis. At least two of the four chassis had defective transmissions (a third chassis would not start so Weinheimer never checked its transmission), and one of these two was Flxible chassis number 3979, the same chassis Sadler testified that Tatum had examined. When Weinheimer inspected chassis number 3978, the Rudolph chassis, the transmission was properly aligned and functioning normally. Id. at 322-32. This testimony, coupled with Tatum's testimony that he realigned the transmission of the chassis he had examined and the testimony of several witnesses that immediately after the October 4 accident the Rudolph chassis's transmission was misaligned, casts serious doubt upon Sadler's insistence that Tatum did not in fact examine the Rudolph chassis. The jury was therefore entitled to find that Tatum studied and repaired the Rudolph chassis. Upon such a finding, Tatum's opinion that the chassis's solenoid was corroded would become relevant and worthy of acceptance. See Fed.R.Evid. 104(b)
 
 
 [6]
 The parties stipulated that the solenoid in evidence was the one on the Rudolph chassis at the time of the accident and that when Weinheimer removed it from the chassis its condition had not changed. Record, vol. II, at 87. But there was no stipulation that the solenoid was in substantially the same condition at the time of trial as it was when Weinheimer removed it from the chassis
 
 
 [7]
 Ford suggests that the rust to which Weinheimer referred was probably the rust Dale mentioned was present on the bracket which held the solenoid to the chassis rather than in the internal workings of the solenoid. Record, vol. III, at 596. While the jury might have inferred that this was the rust to which Weinheimer made reference, it was free to conclude that he in fact spoke of rust in the interior of the solenoid
 
 
 [8]
 While some supports had been removed from the Thomas chassis's steering column before it reached Thomas, it had not yet entered the Flxible assembly process. Nevertheless, Ford maintains that the Thomas chassis's transmission was probably misaligned by Flxible employees. In our view, it is equally likely that this chassis, which may well have been the Rudolph chassis, was defective when it was delivered by Ford. At any event, it was clearly a matter for the jury to determine
 
 
 [9]
 Ford also points to a demonstration Dale performed before the jury in which he was able to misalign the transmission on a model chassis though the jamnut was tight. The demonstration may have taken place, but it is not reflected in the record. See Record, vol. III, at 655-56. Accordingly, we cannot consider it on appeal
 
 
 [10]
 The parties stipulated that the Rudolph chassis was driven at least three times between its arrival at Flxible and its entry onto the assembly line. Record, vol. II, at 86-87
 
 
 [11]
 At one point, Robert Dale conceded that a chassis with a misaligned transmission could possibly emerge from the Ford plant despite Ford's inspection procedures. Record, vol. III, at 662. This concession, coming from Ford's chief witness, reinforces our view that the negligent inspection claim was properly submitted to the jury
 
 
 [12]
 Although some evidence was presented concerning Ford's failure to warn Flxible that a solenoid might become defective if left exposed to the weather, the district court did not charge the jury on this issue. Record, vol. III, at 762-64. Accordingly, the question is not before us
 
 
 [13]
 The district court charged the jury, in pertinent part, as follows:
 I charge you as members of the jury that, under the law of Alabama, there is no duty on the manufacturer, marketer, or seller of a product to warn a purchaser of a danger which is known to a purchaser, or which, in the exercise of reasonable care, should have been known to the purchaser. I charge you that, if you are reasonably satisfied from a preponderance of the evidence in this case that the danger, if any, of altering, modifying or changing the automatic transmission in the . . . chassis in question was known to the Plaintiff's employer, or in the exercise of reasonable care, should have been known to the Plaintiff's employer at the time said chassis was delivered to the Plaintiff's employer, then you may not return a verdict in favor of the Plaintiff and against this Defendant based on any theory of failure to warn.
 Record, vol. III, at 763-64. The parties chose to litigate this case under Alabama law. The propriety of this charge is not questioned in this appeal, and we venture no opinion thereon.
 
 
 [14]
 We note that the district court admitted several photographs, offered by Ford, which fairly represented the Rudolph chassis's appearance at the time of the accident and accordingly had no tendency to confuse the jury. E. g., Record, vol. III, at 462-63. Further, Robert Dale constructed a model of the Rudolph chassis which was in evidence at the trial and on which Ford could point out the various vehicle parts referred to in witnesses' testimony. We fail to see how Ford can claim real prejudice in these circumstances