Opinion for the court filed by Circuit Judge BRYSON. Concurring in part and dissenting in part opinion filed by Circuit Judge DYK.
BRYSON, Circuit Judge.
Northpoint Technology, Ltd., is the as-signee of U.S. Patent No. 5,761,605 (“the ’605 patent”), entitled “Apparatus and Method for Reusing Satellite Broadcast Spectrum for Terrestrially Broadcast Signals,” and U.S. Patent No. 6,169,878 (“the ’878 patent”), entitled “Apparatus and Method for Transmitting Terrestrial Signals on a Common Frequency with Sat *1303 ellite Transmissions.” Northpoint asserted the ’605 and ’878 patents against MDS America, Inc. (“MDSA”) and MDS International, S.A.R.L. (“MDSI”) in an action filed in the United States District Court for the Southern District of Florida. Following a trial, a jury determined that MDSA had infringed claim 8 of the ’605 patent and claims 1 and 7 of the ’878 patent. The jury determined, however, that those three claims were invalid. The district court subsequently denied North-point’s motion for judgment as a matter of law (“JMOL”) that the three asserted claims were not invalid, and the court denied Northpoint’s motion for a new trial. The district court entered judgment on the verdict. Northpoint appeals from the denial of its motion for JMOL regarding validity and the denial of a new trial. MDSA cross-appeals from the aspect of the judgment finding that it infringed claim 8 of the ’605 patent and claims 1 and 7 of the ’878 patent. MDSA and MDSI jointly cross-appeal, contending that the district court should have extended the judgment of invalidity to all the remaining claims of the two patents in suit. We affirm the judgment in all respects.
I
In the early 1980s, the Federal Communications Commission (“FCC”) began allowing direct broadcast satellite service (“DBS”) from satellites in geosynchronous orbit, using the frequency range from 12.2 to 12.7 Gigahertz, to provide audio and video programming to users. The FCC recognized that multiple satellites could transmit on the same frequencies if the satellites were spaced apart by at least nine degrees in longitude and if users employed highly directional antennas to receive the DBS signals. There are now multiple geosynchronous satellites transmitting service on the same frequencies to most geographical locations in the United States at any given time. Because of the directionality of the receiving antennas and the longitudinal separation of the satellites, a user can receive a signal from one satellite, and avoid interference from signals transmitted by other satellites, by pointing a directional antenna at the satellite that is transmitting the desired signal.
Most DBS satellites provide coverage to the entire continental United States. The satellites do not provide local television programming to most users, because each satellite can transmit only a limited number of channels, and the satellites therefore typically transmit only those channels that contain programming of national interest. As a result, most DBS users cannot receive local channels that include matters of local interest, such as local news, weather, and advertising.
Northpoint’s invention claims to solve this problem by terrestrially broadcasting local programming on the same frequencies that are used by the DBS system in a manner that permits both signals to be received at the user location at the same time without interfering with each other. The concept underlying the invention is that the DBS satellites are in geosynchronous orbit above the equator and therefore transmit in a northerly direction to the North American continent. Accordingly, a directional antenna employed at a user location in the United States must be pointed south towards the satellite in order to receive the signal. Northpoint’s preferred embodiment of the invention transmits terrestrial signals from north of the user’s location to a second directional antenna at the user’s location that is pointed northward towards the terrestrial transmitter, as depicted below.
*1304 [[Image here]]
According to Northpoint, the terrestrial signal will not interfere with the DBS signal or vice versa because the terrestrial signal will be transmitted in a specific azimuth spaced away from the DBS satellite-to-user azimuth. Northpoint claims that in such a case, the signal received by each antenna at the user location will be outside the “directional reception range” of the other antenna. Claim 8 of the ’605 patent provides as follows:
A method for simultaneously providing local originating signals on a common frequency with direct broadcast satellite signals transmitted from a satellite, where the satellite is a first satellite location in geosynchronous orbit about the earth, the method comprising the steps of:
(a) at a user location, receiving direct broadcast satellite signals at a first frequency with a first antenna adapted to receive signals at the first frequency only within a first directional reception range as measured from a centerline of the first antenna;
(b) transmitting terrestrial signals at the first frequency and in a terrestrial azimuth range from a terrestrial transmitter, the terrestrial azimuth range being outside of the directional reception range of the first antenna positioned to receive direct broadcast satellite signals from the satellite; and
(c)at the user location, remote from the terrestrial transmitter, receiving the terrestrial signals with a second antenna adapted for receiving signals at the first frequency only within a second directional reception range as measured from a centerline of the second antenna, the second antenna being aligned so that the direct broadcast satellite signals transmitted by the satellite are not transmitted within the directional reception range of the second antenna.
Claim 1 of the ’878 patent recites the apparatus for transmitting the satellite and terrestrial signals, as follows:
An apparatus for simultaneously transmitting terrestrial signals on a common frequency with satellite signals transmitted from a satellite, the satellite transmitting satellite signals at a first frequency to a user location for reception only within a satellite directional reception range about the user location, the apparatus comprising:
(a) a directional terrestrial transmitter for transmitting terrestrial signals at the first frequency in a limited azimuth range around the location of the terrestrial transmitter, the terrestrial transmitter being located with respect to the user location such that the terrestrial transmitter transmits to the user location along a route which is outside of the satellite directional reception range.
*1305 Claim 7 of the ’878 is the corresponding method claim to claim 1:
A method for simultaneously providing terrestrial signals on a common frequency with satellite signals transmitted from a satellite, where the satellite is transmitting at a first frequency along a satellite transmission axis extending from the satellite to a terrestrial user location, the method comprising the step of:
(a) transmitting terrestrial signals at a first frequency in a limited azimuth range from a terrestrial transmitter, the terrestrial transmitter being located with respect to the user location so as to transmit to the user location along a transmission route which is outside of a satellite directional reception range about the user location, wherein the satellite directional reception range comprises a limited directional range substantially centered on the satellite transmission axis.
In 1999 Northpoint and two other companies applied to the FCC for permission to provide terrestrial Multichannel Video Distribution and Data Service (“MVDDS”) in the DBS frequency range of 12.2 to 12.7 GHz. Congress authorized the FCC to select an independent engineering firm to determine whether terrestrial and satellite use of the same bandwidth was feasible without causing interference. The FCC hired the Mitre Corporation, a not-for-profit engineering company that studies engineering issues for the government, to make that determination. Mitre’s analysis concluded that “MVDDS sharing for the 12.2-12.7 GHz band currently reserved for DBS poses a significant threat to DBS operation in many realistic operational situations.” However, Mitre also concluded that a “wide variety of mitigation techniques ... if properly applied under appropriate circumstances” could possibly reduce or eliminate interference, but that bandsharing appeared to be feasible “if and only if suitable mitigatory measures” were used.
In 2002 the FCC adopted rules based on Mitre’s analysis to allow terrestrial MVDDS in the DBS frequency range of 12.2 to 12.7 Gigahertz. MDSA applied to the FCC for an experimental license to test and prove its MVDDS system. The FCC granted the license, and MDSA arranged for a third party to perform tests in Florida using equipment furnished by MDSI. Northpoint became aware of the test in Florida and warned MDSA that performing the test would infringe its patents. After the conclusion of the Florida tests, Northpoint brought this action, asserting that MDSA and MDSI had infringed Northpoint’s patents. In the Joint Pretrial Stipulation, Northpoint limited the asserted claims to claim 8 of the ’605 patent and claims 1 and 7 of the ’878 patent. After Northpoint presented its infringement case, the defendants moved for JMOL of noninfringement of the unassert-ed claims in the ’605 and ’878 patents. The district court denied that motion. After the defendants finished presenting their case, the jury found that MDSA did, and MDSI did not, infringe the three asserted claims. The jury also found, however, that each of those claims was invalid as anticipated, obvious, not enabled, and indefinite. Following the denial of post-trial JMOL motions, the district court entered final judgment, from which the parties filed the instant appeal and cross-appeal.
II
We agree with the district court that substantial evidence supports the jury’s verdict that the asserted claims were invalid based on anticipation. We also agree that substantial evidence supports the jury’s verdict on enablement and that the district court therefore correctly entered *1306 judgment that the claims were invalid for lack of enablement. Because we uphold the judgment as to invalidity on those grounds, it is not necessary for us to reach the issues of obviousness and indefiniteness. We also do not reach the cross-appeal with respect to claim construction. We agree that the district court correctly denied Northpoint’s motion for a new trial, and we also agree that the district court correctly denied the defendants’ motion for JMOL of invalidity with respect to all the unasserted claims of the ’605 and ’878 patents.
A
The defendants assert that four prior art references introduced at trial anticipate each asserted claim of the ’605 and ’878 patents. The evidence showed that each of those references teaches the importance of proper pointing of antennas to avoid interference between satellite and terrestrial systems broadcasting on the same frequency. The strongest of the four references is a paper entitled “Sharing the UHF Between Space and Terrestrial Services,” written by John Hult and published in 1970, more than 25 years before the priority date of the ’605 and ’878 patents. Northpoint argued that the 1970 Hult reference did not anticipate the asserted claims of the ’605 and ’878 patents because it failed to disclose the “directional reception range” limitation in all three claims.
The district court construed the term “directional reception range” to refer to “[a] three-dimensional space about the cen-terline of a receiving antenna within which a usable signal can be received, a usable signal being a signal from which the information carried by it can be extracted.” Thus, for a transmitted signal to be received inside the directional reception range of an antenna, as the court construed that term, the receiving antenna must be able to extract the information carried by the signal. Northpoint did not challenge the district court’s construction of the term “directional reception range” at trial, and we adopt the district court’s construction of that term.
Northpoint argues that the Hult reference does not anticipate the asserted claims because nothing in Hult requires that the satellite receiving antenna and the terrestrial receiving antenna physically point in different directions. For that reason, Northpoint contends, Hult discloses a system in which the satellite and terrestrial signals are not transmitted outside of the “directional reception range” of the terrestrial and satellite receiving antennas.
Northpoint’s argument is based on a misinterpretation of the trial court’s construction of the term “directional reception range.” Northpoint interprets that term to be limited to an area at which a receiving antenna is physically aimed. In fact, however, the district court did not construe the term “directional reception range” so narrowly, nor did the evidence support such a narrow construction. Rather, the court’s construction defined the term “directional reception range” with reference to the three-dimensional space in which the antenna could receive a usable signal, and not solely with reference to the physical positioning of the antenna.
Although the court’s construction referred to the “centerline” of the receiving antenna, neither the court’s construction nor the evidence at trial suggested that the “centerline” of the antenna was a physical feature of the antenna divorced from the area from which the antenna could receive a usable signal. The common specification of the ’605 and ’878 patents describes the “centerline” in terms of the antenna’s maximum directional reception range, see ’605 patent, col. 4, II. 24-30, and Northpoint’s expert testified that the antenna’s center-line is the “center of the beam pointing towards the satellite.” Moreover, he ex *1307 plained that the centerline of the beam is not necessarily the same as the physical, or “geometric center” of the receiving device, such as a parabolic dish .antenna.
Northpoint’s argument, in essence, is that the adaptive array antennas disclosed in Hult are not directional and that they “operate in fundamentally different ways” from the antennas of the patented invention because they reject and ignore the unwanted satellite signal, while the claimed invention depends on preventing overlap of the directional reception range of the terrestrial and satellite receivers by pointing the antennas in opposite directions. However, nothing in the asserted claims requires that the receiving antennas be physically pointed at the sources of the satellite and terrestrial signals. Claim 8 of the ’605 patent merely requires that the two antennas be “adapted” to receive signals within a first and second directional reception range, and that the first be “positioned” to receive DBS signals from the satellite, while the second is “aligned” so that the DBS signals are not within that antenna’s directional reception range. The apparatus and method claims of the ’878 patent merely require a directional terrestrial transmitter to transmit along a route that is outside the directional reception range of the satellite transmissions.
The defendants’ expert, Philip Rubin, explained to the jury that an antenna’s directionality is based on many factors, including the shape of the reflective dish, in the case of dish-type antennas. When asked,- “[n]ow, the directionality comes from the dish itself, doesn’t it,” Mr. Rubin answered, “[fjrom the shape, from the shape of the dish.” He stated that while he used dish-type antennas to explain how antennas work, because most people are familiar with dish antennas, there are many other types of directional antennas in use. He then explained that antennas have varying levels of gain in -different directions and that signals arriving from directions with higher levels of gain are detected, while signals arriving from outside those directions are not. He also explained that although an antenna may not be physically pointed at an angle to be aligned with a satellite, it is within the directional reception range of the satellite transmission if the direction of greatest gain is aligned with the .satellite transmission angle. Finally, he explained that the adaptive array antenna used in Hult was “as much of a direction[al] antenna as any antenna I’ve ever known,” and that “you could create devices which change the beam without moving [the antenna].”
Northpoint’s expert,' Dr. Edward Miller, agreed that an adaptive array antenna is directional. He stated that “through a complex process such as the computer control of the amplitude and phase, such an adaptive array can be made to have a gain in a limited range of directions.” He further elaborated on how the reception range in an adaptive array antenna was created by pointing the antenna in the desired direction while electronically creating nulls in the directions of unwanted signals. He explained that nonadaptive antennas have fixed directions of maximum and minimum gain based on their physical characteristics.
Far from teaching away from the claims of the ’605 and ’878 patents, as Northpoint argues, the Hult reference describes an antenna in which the directional reception range is generated by creating areas of high gain in certain directions from the antenna and areas of little or no gain in other directions. The terrestrial signal in Hult is outside the directional reception range of the satellite receiver because there is a null in the gain of the satellite receiving antenna in the direction of the terrestrial transmitter, which prevents the *1308 satellite antenna and receiver from receiving a signal from the terrestrial transmitter from which usable information can be extracted. When asked if steering nulls in the direction of an interfering signal meant that the receiving antenna was being configured so that it would not receive those signals, Dr. Miller answered that it did.
The electronically created null in an adaptive array antenna acts exactly like a null in a dish-type antenna that is the product of the antenna’s shape. In both cases, an interfering signal may reach the antenna from a particular direction, but the antenna has no gain in that direction and hence does not receive a usable signal from which information can be extracted (or interference created). As both experts explained, the signal reaches the antenna, but the gain in the direction of the signal is so low that the signal cannot be received and processed. For that reason, the Hult reference and the expert testimony regarding it made clear that the unwanted signal in Hult is outside the directional reception range of the antenna as that term is used in the ’605 and ’878 patents. Accordingly, there was substantial evidence from which a jury could find that the Hult reference taught the separate “directional reception ranges” recited by Northpoint’s patents and therefore anticipated the asserted claims.
The dissent contends that “there can be no serious contention that the adaptive array antennas of Hult do not limit the ‘directional reception range’ using physical pointing.” As Mr. Rubin’s testimony makes clear, however, Hult discloses the avoidance of interference not only by steering nulls using adaptive array techniques, but also by directional pointing of the antennas. Mr. Rubin explained that Hult discloses that if a satellite “is more than 15 degrees above the horizon, all the interfered-with receivers could easily be remedied by small changes in antenna pointing.” In the same passage, Hult refers to “the directional discrimination obtained” with the terrestrial television receiving antennas, resulting in most of those antennas not having unacceptable “antenna gains in the direction of the satellite.” Thus, while Hult concentrates on the benefits to be obtained from the use of adaptive arrays, the evidence at trial made clear that it also discloses the use of physical pointing of directional antennas to reduce interference in the context of a dual satellite-terrestrial transmitting system.
B
The defendants’ theory of lack of enablement was that the patents do not disclose “a way to provide an antenna that cannot receive signals from unwanted directions” in order to meet the “directional reception range” limitation of each claim. Mr. Rubin testified that the DBS satellite receiving antenna could receive signals in directions away from where the antenna was pointed. The need to avoid interference from those signals, he testified, was the reason that the power level of the terrestrial transmission and the mitigation techniques described in the Mitre report were so important. As he described the problem, if the signal power was too high, the terrestrial signal could be received by the satellite receiving antenna even though the satellite receiving antenna was pointed away from the terrestrial transmitter. Northpoint’s expert agreed that DBS antennas operate in that manner.
Dr. Bahman Badipour, who conducted the allegedly infringing tests in Florida, testified that it was important to maintain the correct flux density (electromagnetic power) measurements at the level identified by the Mitre report. Dr. Badipour also testified that when he conducted the tests he offset the carrier frequency of the terrestrial signal by more than six Megah *1309 ertz from the DBS carrier frequency in order to further reduce interference between the two signals. The defendants did not assert that antennas with a directional reception range do not exist; rather, they asserted that Northpoint did not disclose enough in the patent to enable one of ordinary skill in the art to implement an antenna that would have a directional reception range as recited in the claims.
Northpoint argues that the record contains no evidence that undue experimentation would be necessary to practice the invention based on the disclosure in the patents. We agree with the district court, however, that the evidence at trial, including evidence of undue experimentation, was sufficient to sustain the jury’s verdict on enablement. One of the inventors of the ’605 and ’878 patents, Carmen Tawil, admitted that numerous parameter values and interference mitigation techniques were used in the first test of Northpoint’s technology. Northpoint submitted a report of its first test to the FCC with an attached appendix listing the techniques it used to avoid interference. The appendix stated that Northpoint mitigated interference by using several techniques including directional transmission, transmit antenna discrimination in the vertical plane, beam tilting, and maximum height antenna placement. Ms. Tawil admitted that none of those techniques were described or disclosed in the two patents, but she insisted that one of skill in the art would know to apply them.
Ms. Tawil testified that Northpoint’s report to the FCC included specific values used for the following parameters: polarization, antenna gain, transmit power, effective isotropic radiated power, the transmit height above average terrain, the transmit height above ground level, transmitter tilt above horizontal, required signal strength at edge of cell, cell size, receiving antenna gain, and thermal noise floor. Although none of those parameters were discussed in the ’605 and ’878 patents, Ms. Tawil stated that a person of skill in the art would have known all of those values without undue experimentation when implementing the Northpoint technology. Ms. Tawil’s testimony on that point, however, was contradicted by Mr. Rubin, who testified that the claimed system would work only if the terrestrial signal was transmitted at a particular power level that would depend on experimentation based on all of those parameters. Ms. Tawil’s testimony on enablement is also contradicted by the conclusions from the Mitre report, which detailed a very comprehensive experiment to test Northpoint’s technology. One of the conclusions from the Mitre report was that there were three categories of techniques that could be used to reduce interference, one being the selection of operational parameters for: (1) lowering transmitter power; (2) using a frequency offset between the terrestrial and DBS carriers; (3) increasing the terrestrial transmitting antenna height; (4) adjusting the elevation tilt of the terrestrial transmitting antenna; and (5) pointing the terrestrial transmitting antennas away from the satellites.' Ms. Tawil testified that she provided Mitre with the testing parameters as well as -the mitigation techniques Northpoint used in its test. Nonetheless, even using those parameters and techniques, Mitre still found that the terrestrial signal interfered with the DBS signal, or that the signals were inside the directional reception range of each receiver. Only after Mitre performed additional experimentation and applied additional parameters and techniques was it able to deliver the terrestrial signal outside the directional reception range of the satellite receiving antenna, as required by the asserted claims.
Although Northpoint argues that the evidence showed that one could implement *1310 the invention using a standard satellite dish purchased from Radio Shack, Dr. Miller’s testimony does not support that assertion, and the jury heard other evidence indicating that implementing the invention was not so straightforward. Thus, Dr. Badipour testified about the amount of testing he performed. He explained that he first went to France to test the defendants’ equipment parameters, that he read the Mitre report and reports from DBS providers, and that he incorporated the results from his initial equipment testing and the interference mitigation techniques from Mitre’s experimentation into a test plan to submit to the FCC. Once he developed the FCC test plan, he further tested the equipment in Virginia before taking the equipment to Florida. Based on that evidence, the jury could properly conclude that the techniques for avoiding interference were not so plain to a person of skill in the art so as to obviate the need for any enabling disclosure in the patent.
Finally, Northpoint contends that Mr. Rubin testified that antennas with directional reception range have been available since the 1940’s. What Mr. Rubin actually stated was that directional antennas had been available for many years. The defendants’ point, however, was not that the patents failed to enable directional antennas, but that they did not enable one of skill in the art to create the directional reception range necessary to avoid interfering signals. In light of our review of the evidence at trial, we agree with the district court that the jury’s finding of lack of enablement was supported by substantial evidence. The district court therefore correctly entered judgment that the asserted claims were invalid for lack of en-ablement.
The dissent contends that the evidence at trial was not sufficient to show that “undue experimentation” would be required to make the patented invention function as it was claimed to do. While determining whether the required amount of experimentation is “undue” is an inherently imprecise undertaking, the jury was properly instructed as to its task, and it reached a reasonable conclusion. The evidence, including the testimony of experts about the nature of the experimentation conducted by the defendants and others, was sufficient to show that elaborate measures, not described or even adumbrated by the patent, were required to make the claimed invention effective. See Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1374-75 (Fed.Cir.1999) (no enablement when “the teachings set forth in the specifications provide no more than a ‘plan’ or ‘invitation’ for those of skill in the art to experiment”). To be sure, no witness testified in haec verba that the experimentation was “undue.” But we know of no principle that requires that a witness testify as to that legal conclusion, as long as the factual showing is sufficient to justify the jury’s conclusion on the highly factual issue of whether, under all the circumstances, more than routine experimentation was needed to make the invention work. See PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1564 (Fed.Cir.1996). Because that requirement was amply satisfied in this case, the district court properly denied Northpoint’s motion for judgment as a matter of law on the enablement issue.
C
Northpoint contends that we should grant a new trial on two theories. First, Northpoint claims that the evidence of invalidity was so weak that the district court should have granted Northpoint’s motion for a new trial because the verdict was against the clear weight of the evidence. Because the right to a new trial is a procedural issue not unique to patent law, the applicable law is the law of the *1311 regional circuit to which an appeal would lie in a non-patent case. EMI Group N. Am., Inc. v. Cypress Semiconductor Corp., 268 F.3d 1342, 1347 (Fed.Cir.2001). In this case, that court is in the Eleventh Circuit. The test applied in the Eleventh Circuit to an appeal from the denial of a new trial motion is whether the trial court abused its discretion in concluding that the verdict was not against-the clear weight of the evidence. See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1196 (11th Cir.2004); Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir.2001). In light of the evidence on anticipation and enablement discussed above, we hold that the district court did not abuse its discretion in concluding that the verdict was not against the clear weight of the evidence. We therefore uphold the denial of a new trial on that ground.
Northpoint next argues that it should be granted a new trial because, if alternative theories of liability are asserted together in one jury instruction, “a new trial is to be granted if any one of the alternatives is unsupported by substantial evidence.” Cronin v. Wash. Nat’l Ins. Co., 980 F.2d 663, 669 n. 7 (11th Cir.1993); see also Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co., 781 F.2d 1520, 1529 (11th Cir.1986); King v. Ford Motor Co., 597 F.2d 436, 439 (5th Cir.1979). North-point argues that it is entitled to a new trial on that theory because the jury decided the issues of invalidity on “several alternative legal theories, at least one of which in each case is defective.” In particular, Northpoint notes that the defendants argued anticipation based on five different prior art references; Northpoint suggests that each of those references represents a separate legal theory of anticipation, and that a failure of proof with regard to any one of the five requires the grant of a new trial.
We disagree with Northpoint’s characterization of the anticipation issue at trial. The cases on which it relies involve separate legal theories of recovery, where at least one of the theories is legally flawed. By contrast, the five prior art references offered to prove anticipation in this case did not represent separate legal theories, but instead simply provided separate factual bases for the jury to consider with regard to the single legal theory of anticipation.
As a general matter, it is not necessary for every possible factual basis for liability to be independently sufficient in order for the evidence to be sufficient to support a jury verdict. A failure of proof with respect to any single item of evidence does not justify a grant of either JMOL or a new trial; even if some of the proposed factual grounds for liability are not legally sufficient to support a verdict, that is not fatal, because the critical question is whether the evidence, taken as a whole, was sufficient to support the jury’s verdict. In Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court explained in the context of a criminal case the rationale behind the distinction between an invalid legal theory of liability and an insufficient factual ground for decision:
When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence ....
502 U.S. at 59, 112 S.Ct. 466 (emphasis in original); see also Walther v. Lone Star Gas Co., 952 F.2d 119, 126 (5th Cir.1992) (“we will not reverse a verdict simply because the jury might have decided on a *1312 ground that was supported by insufficient evidence”); Sandberg v. Va. Bankshares, Inc., 891 F.2d 1112, 1122 (4th Cir.1989) (“the submission of both correct and incorrect factual bases supporting a single theory of recovery is not grounds for reversal”), rev’d on other grounds, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); McCord v. Maguire, 873 F.2d 1271 (9th Cir.1989) (“When a general verdict may have rested on factual allegations unsupported by substantial evidence, we will uphold the verdict if the evidence is sufficient with respect to any of the allegations.”); Baumler v. State Farm Mut. Auto. Ins., 493 F.2d 130, 134 (9th Cir.1974) (“where there are two alternative factual theories which might support the verdict, the verdict will be upheld if there is sufficient evidence to support either theory”).
In the context of this case, the question is whether the evidence as a whole was sufficient to enable a reasonable jury to conclude, by clear and convincing evidence, that the asserted claims of the ’605 and ’878 patents were anticipated. The inadequacy of any particular item of evidence to establish anticipation, such as the failure of any particular reference to contain all the limitations of the asserted claims, would not undermine the verdict as a legal matter. In this case, the evidence with respect to at least one of the prior art references was sufficient to prove anticipation of the asserted claims. Accordingly, we uphold the district court’s order denying Northpoint’s motion for a new trial on the issue of invalidity.
D
In their cross-appeal, the defendants argue that they are entitled to have the judgment of invalidity as to the three asserted claims extended to all the remaining claims in the ’605 and ’878 patents. We disagree. In the pretrial stipulation, the plaintiffs asserted infringement only as to claim 8 of the ’605 patent and claims 1 and 7 of the ’878 patent, and the defendants asserted invalidity only as to those three claims. At trial, the parties introduced evidence of infringement and invalidity only as to those three claims, and the jury’s verdict was limited to those claims. In accordance with the jury’s verdict, the court entered judgment of invalidity only as to the three asserted claims. The defendants now contend that, based on comments made by Northpoint’s attorney at the close of the plaintiffs case, the other claims of the ’605 and ’878 patents should be held invalid in light of the jury’s verdict as to the three litigated claims.
We have examined the attorney’s comments and conclude that those comments do not provide a basis for holding the unasserted claims of the ’605 and ’878 patents invalid. In the colloquy to which the defendants refer, Northpoint’s attorney stated, in response to a Rule 50 motion to hold the other claims not infringed, that “the outcome should be determined by the claims we presented.” The attorney expressed his understanding that the parties had agreed that “we would present representative claims instead of every claim in the patent ... and then the outcome as to those patents, all claims, would be dictated by the outcome on the three [claims] we presented.” The attorney explained that “those claims will dictate the outcome as to the complaint,” because any further action on the unasserted claims would be barred by res judicata.
The defendants now contend that the effect of the attorney’s statements at the time of the defendants’ Rule 50 motion on infringement was to concede that any verdict on invalidity would apply to all the unasserted claims of the two patents in suit. We do not interpret Northpoint’s attorney’s comments in that manner. Northpoint’s attorney was focused on the issue of infringement and indicated that a Rule 50 judgment of noninfringement on *1313 those claims would not be appropriate, but that because of res judicata principles there was no risk that those claims would be asserted against the defendants in a subsequent action. Northpoint’s attorney did not address the issue of invalidity, and neither the judge nor counsel for the defendants raised the issue of invalidity at that time. Instead, the trial proceeded in accordance with the pretrial stipulation, with the defendants putting on evidence as to the invalidity of the three claims at issue. The defendants did not offer evidence as to the invalidity of any other claims of the two patents in suit, and the court accordingly did not enter a judgment as to those other claims. We do not regard Northpoint’s attorney as having done or said anything that would require the district court to enter a judgment of invalidity as to the unasserted claims. In fact, to the extent that those claims were ever asserted, the court appears to have treated them as having been dismissed. Accordingly, the court’s judgment of invalidity was properly limited to the three claims asserted at trial.
Each party shall bear its own costs for this appeal.
AFFIRMED.